# IN THE SUPREME COURT OF IOWA

No. 15–1661

Filed June 30, 2016

Amended October 25, 2016

**KELLI JO GRIFFIN,**

    Appellant,

vs.

**PAUL PATE,** In His Official Capacities as the Secretary of State of Iowa, and **DENISE FRAISE,** In Her Official Capacities as the County Auditor of Lee County, Iowa,

    Appellees.

---

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

Claimant appeals district court ruling holding her drug conviction fell within the scope of "infamous crime" as used in article II, section 5 of the Iowa Constitution. **AFFIRMED.**

Rita Bettis of ACLU of Iowa Foundation, Des Moines, and Julie A. Ebenstein and Dale E. Ho of ACLU Foundation, Inc., New York, New York, for appellant.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, Meghan L. Gavin, Assistant Attorney General, and Michael Short, Lee County Attorney, for appellee.

Gary D. Dickey of Dickey & Campbell Law Firm, PLC, Des Moines, for amicus curiae Polk County Auditor Jamie Fitzgerald.

Coty R. Montag, Washington, D.C., John B. Whiston of Clinical Law Programs, University of Iowa, Iowa City, until withdrawal, and then John S. Allen of Clinical Law Programs, University of Iowa, Iowa City, and Christina A. Swarns, Angel S. Harris, and Joshua A. Rosenthal, New York, New York, for amicus curiae The NAACP Legal Defense & Educational Fund, Inc.

Alan R. Ostergren, Muscatine County Attorney, for amicus curiae Iowa County Attorneys Association.


Mark McCormick of Belin McCormick, P.C., Des Moines, Carmen Beauchamp Ciparick of Greenberg Traurig, LLP, New York, New York, and Myrna Pérez of Brennan Center for Justice at NYU School of Law, New York, New York, for amicus curiae The Iowa League of Women Voters.

Gordon E. Allen, Johnston, for amicus curiae Citizens United for Rehabilitation of Errants.

Joseph C. Glazebrook of Glazebrook, Moe & Hurd, LLP, Des Moines, for amicus curiae Iowa veterans.

Kristi L. Harshbarger, West Des Moines, for amicus curiae Iowa State Association of Counties.

**CADY, Chief Justice.**

This appeal requires us to decide if the crime of delivery of a controlled substance is an "infamous crime" under the voter disqualification provision of the Iowa Constitution. The district court held the crime is an infamous crime, and a conviction thereof disqualifies persons from voting in Iowa. Following the analysis we have used in the past to interpret provisions of our constitution, we agree and affirm the judgment of the district court.

The term "infamous crime" was generally recognized to include felony crimes at the time our constitution was adopted. This meaning has not sufficiently changed or evolved to give rise to a different meaning today. In addition, unlike some past cases when we have interpreted provisions of our constitution, the facts and evidence of this case are insufficient to justify judicial recognition of a different meaning. Constrained, as we must be, by our role in government, we conclude our constitution permits persons convicted of a felony to be disqualified from voting in Iowa until pardoned or otherwise restored to the rights of citizenship. This conclusion is not to say the infamous-crime provision of our constitution would not accommodate a different meaning in the future. A different meaning, however, is not for us to determine in this case. A new definition will be up to the future evolution of our understanding of voter disqualification as a society, revealed through the voices of our democracy.

## I. Background and Proceedings.

Kelli Jo Griffin is an Iowa resident. She is also a citizen of the United States. She is forty-two years old. Griffin engaged in criminal conduct that resulted in a 2008 conviction for the crime of delivery of 100 grams or less of cocaine in violation of Iowa Code section

124.401(1)(*c*)(2)(b) (2007), a class "C" felony. She was sentenced by the district court to a suspended term of incarceration and given five years' probation.[1] Griffin successfully discharged her sentence on January 7, 2013.

On November 5, 2013, Griffin registered to vote and cast a provisional ballot in a municipal election in Montrose, Iowa. Denise Fraise, the Lee County auditor, subsequently determined Griffin was not eligible to vote due to the 2008 felony conviction, and rejected her ballot. Griffin was charged and prosecuted with perjury for registering and voting in the November 5 election. She was acquitted of this crime following a jury trial.

On November 7, 2014, Griffin filed a petition in district court against the governor of Iowa, the secretary of state of Iowa, and county auditor Fraise. The petition asked the court to declare that her felony conviction did not disqualify her under the Iowa Constitution from voting, and it sought other relief in the form of an injunction and mandamus to recognize and protect her right to vote.

The district court dismissed the governor from the lawsuit, and the case proceeded to a summary judgment hearing. The court held Griffin had been disqualified from voting when she was convicted of a felony and further found the county auditor properly rejected her ballot. The

---

[1]Griffin was informed by her attorney at sentencing that her voting rights would automatically be restored after discharge of her sentence. At that time, an Executive Order signed by Governor Thomas J. Vilsack was in effect, which provided for the automatic restoration of the right to vote after discharge from a felony sentence. However, on January 14, 2011, Governor Terry E. Branstad issued a new Executive Order rescinding the automatic restoration process and replaced it with a process that considered any restoration of voting rights for convicted felons on a case-by-case basis. In each case, the convicted felon is required to initiate an application requesting the restoration of rights.

district court rejected her claim that her particular felony conviction was not the type of conviction that disqualified a person from voting. It also rejected her claim that the process to restore voting rights violated her due process rights under the Iowa Constitution.

Griffin exercised her right to ask this court to review the decision of the district court. On appeal, she argues her felony conviction did not disqualify her under the constitution from the privileges of an elector and the voter registration laws that exclude convicted felons who have not had their rights restored from voting are invalid and constitute a violation of her due process rights. Her due process claim is dependent on her predicate argument that her felony conviction did not disqualify her from voting under the constitution.

## II. Standard of Review.

Summary judgment rulings are reviewed for correction of errors at law. *Baker v. City of Iowa City*, 867 N.W.2d 44, 51 (Iowa 2015). If the only concern is the legal consequences of undisputed facts, we resolve the matter on summary judgment. *Id.* Constitutional challenges are reviewed de novo. *Zaber v. City of Dubuque*, 789 N.W.2d 634, 636 (Iowa 2010).

## III. Right to Vote.

Voting has traditionally been viewed in our democratic society as a basic and fundamental right of citizenship. *Chiodo v. Section 43.24 Panel*, 846 N.W.2d 845, 848 (Iowa 2014) (plurality opinion). In our representative form of governing, it serves to give a voice to the people. *Id.* This voice is as important to the democracy as it is to those the democracy governs.

Our constitution establishes the right to vote, but not among those rights enumerated in our bill of rights. Iowa Const. arts. I–II. Our

founders chose to address voting in a separate article of the constitution captioned as both a right and a privilege. *Id.* art. II, §§ 1, 5. The view that voting is a privilege emanates from the constitutional limitations placed on electors. *Id.* §§ 4–5. Electors must be citizens of the United States and residents of Iowa. *Id.* §§ 1, 4. Additionally, otherwise-qualified electors can be disqualified from voting. Under our constitution, a "person adjudged mentally incompetent to vote or a person convicted of any infamous crime shall not be entitled to the privilege of an elector." *Id.* § 5. Thus, voting exists as a fundamental right for people who meet the constitutional qualifications of an elector and are not disqualified by adjudication of incompetency or conviction of an infamous crime. *Id.* §§ 1, 5.

## IV. Role of the Court.

The sole issue in this case is whether the felony crime of delivery of a controlled substance is an infamous crime. Under our system of governing, this issue is now a question for this court to decide. The legislature enacted a statute in 1994 defining an infamous crime as any felony. 1994 Iowa Acts ch. 1180, § 1 (codified at Iowa Code § 39.3(8) (2013)).[2] Yet under our democracy, people have the right to challenge the constitutionality of a legislative enactment that directly affects them, and the judicial branch of government has the responsibility to decide the question. In Iowa, that responsibility ultimately falls to this court.

## V. Analytical Framework.

Our task is to interpret our constitution to decide if it rendered Griffin ineligible to vote and, in turn, permitted the county auditor to

---

[2]"'Infamous crime' means a felony as defined in section 701.7, or an offense classified as a felony under federal law." Iowa Code § 39.3(8).

reject her ballot. We must decide if the felony crime of delivery of a controlled substance is an infamous crime.

In *Chiodo,* we recognized we had never developed a comprehensive analysis to determine the meaning of the infamous-crime disqualification. 846 N.W.2d at 851. It was unnecessary at that time, however, to conduct the in-depth analysis needed to articulate such a standard.[3] The crime claimed to be infamous in *Chiodo* was a misdemeanor, and we were able to resolve the dispute under a standard that only went so far as to exclude misdemeanor crimes from the meaning of infamous crimes. *Id.* at 856–57. We understood the limited nature of the opinion and saved a more complete analysis for a later date. *Id.* at 857. Notwithstanding, the approach taken by the plurality opinion was not out of line with our careful approach in interpreting our constitution. We have often found it wise to take incremental steps in developing constitutional law.

In taking the next step forward today to develop a more complete framework to interpret the infamous-crime language, we are drawn to the approach historically taken by courts when called upon to interpret the meaning of constitutional phrases that necessarily embody social judgments that evolve over time. This approach has allowed courts, for example, to usher the "cruel and unusual punishment" clause from generation to generation as views of punishment evolve. *See generally Trop v. Dulles*, 356 U.S. 86, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958)

---

[3]*Chiodo* was an expedited appeal that traveled through the appellate process with unprecedented speed. The expedited appeal was necessary to meet the deadline for printing ballots prior to the pending election. The notice of appeal from the district court decision was filed on April 2, 2014, and we filed our opinion thirteen days later on April 15, 2014. During this thirteen-day period, the attorneys prepared and filed briefs, oral arguments were held, and three opinions were written.

(discussing the history and evolution of the Eighth Amendment to the United States Constitution). The analysis starts with the understanding that the meanings of these constitutional doctrines are not necessarily static, and it instead considers current prevailing standards that draw their "meaning from the evolving standards . . . that mark the progress of a maturing society." *Id.* at 100–01, 78 S. Ct. at 598, 2 L. Ed. 2d at 642. Thus, the analysis considers the objective indicia of the standards of society as expressed in legislative enactments and other pronouncements and those standards gleaned from the text, history, meaning, and purpose of the constitutional phrase. *Graham v. Florida,* 560 U.S. 48, 61, 130 S. Ct. 2011, 2022, 176 L. Ed. 2d 825, 837 (2010). Like the cruel and unusual punishment clause, the concept of infamy is not locked into a past meaning, but embodies those judgments that reflect its meaning today. Our founders utilized infamy as a concept to govern the disqualification of voters and knew it would ultimately be defined by the prevailing standards of each generation. Community standards exist to shape these constitutional principles until they evolve into a new standard or it is determined they are no longer supported by our evolving knowledge and understanding. This approach reveals the enduring strength of our constitution.

Accordingly, we follow the constitutional approach we have followed in other cases of constitutional interpretation to decide the meaning of an infamous crime today. We begin by looking back to review the history of infamy to gain a better understanding of the concept as we apply it in this case.

**VI. History of Infamy.**

**A. Common Law History.** The concept of infamy originated in ancient Greece and Rome. *See* Mirjan R. Damaska, *Adverse Legal*

*Consequences of Conviction and Their Removal: A Comparative Study*, 59 J. Crim. L. Criminology & Police Sci. 347, 351 (1968) [hereinafter Damaska]. It described the loss of various rights of citizenship associated with the punishment for certain heinous crimes or moral turpitude. *Id.* Infamy was a "civic disability, conceived consciously as based on a moral imperfection." A.H.J. Greenidge, *Infamia: Its Place in Roman Public and Private Law* 13 (Oxford, Clarendon Press 1894). Different levels of infamy existed, from suspension of voting rights to testimonial disqualification. *Id.* at 6. Thus, infamy was a moral censure pronounced by the government as a result of acts of moral turpitude. *Id.* at 18–19, 37.

The concept of infamy was absorbed into the canon law of the church and from there disseminated into the laws in Europe. *See* 1 Julius Goebel, Jr.*, Felony and Misdemeanor: A Study in the History of English Criminal Procedure* 70–73 & nn.17–22 (1937). Indeed, "the infamy notion be[came], for both church and state, basic to their schemes of law enforcement, and eventually to the whole structure of human relationships." *Id.* at 73. In some countries during the Middle Ages, the use of publicly degrading punishments like the pillory resulted in infamy. Damaska, 59 J. Crim. L. Criminology & Police Sci. at 351. In France, infamy eventually developed into the loss of civil rights, including the exclusion from public office, deprivation of the right to vote or be elected, disqualification from testimonial capacity, disqualification from acting as guardian or conservator, and prohibition from bearing arms or serving as a teacher. *Id.* at 352–53.

By the eighteenth century, English common law recognized two kinds of infamy—one respecting the mode of punishment and the other the future credibility of the person. William Eden, *Principles of Penal*

*Law* ch. 7, § 5, at 61 (3d ed. London, B. White 1772). The law expressed the notion that "the stamp of ignominy [was] . . . [the] best instrument for the promotion of morality, and the extirpation of vice." *Id.* § 2, at 57. Infamous punishments included corporal punishments—"affecting the body and publicly inflicted"—and "degradations from titles of honour, civil incapacities, brandings, and public exhibitions of the offender"; they were to be limited to "offences infamous in their nature." *Id.* § 3, at 58–59. The stamp of infamy and accompanying civil incapacity served both a retributive goal by depriving those who break society's rules of society's privileges and a deterrent goal by the stigmatizing effect of the humiliation and isolation offenders suffered in small communities. Howard Itzkowitz & Lauren Oldak, Note, *Restoring the Ex-offender's Right to Vote: Background and Developments*, 11 Am. Crim. L. Rev. 721, 726–27 (1973).

A person's position in society depended in part on their character and individual worth, and a bad character by itself was sufficient to incapacitate a person's ability to swear an oath. Diane L. Zimmerman, *Requiem for a Heavyweight: A Farewell to Warren and Brandeis's Privacy Tort*, 68 Cornell L. Rev. 291, 327–28 (1983). Without the ability to swear an oath, the person could not participate in legal proceedings as a plaintiff, a witness, or even to clear himself when charged. *Id.* at 328. Those deemed infamous suffered civil degradation by losing the rights of citizenship such as "the right to testify in court, bring civil prosecution, serve on juries, hold public office, or enlist in the army." Pippa Holloway, *Living in Infamy: Felon Disfranchisement and the History of American Citizenship* 3–4 (2014) [hereinafter Holloway].

The crimes that fell into the infamous category at common law were treason, felony, and the *crimen falsi.* 2 Francis Wharton, *A Treatise*

*on the Criminal Law of the United States* § 758, at 416 (4th rev. ed., Phila., Kay & Bro. 1857) [hereinafter Wharton 1857]. It is helpful to consider the meaning of each category as developed over time. Treason today is generally associated with actions taken expressly against the state by attempting to overthrow the government or aiding its enemies. *See* U.S. Const. art. III, § 3, cl. 1; Iowa Const. art. I, § 16; *Treason,* Black's Law Dictionary (10th ed. 2014). However, when English common law was still developing, two levels of treason were set in a fourteenth century statute: high treason and petty (or *petit*) treason. Theodore F.T. Plucknett, *A Concise History of the Common Law* 443 (5th ed. 1956) [hereinafter Plucknett]; *see also* 4 William Blackstone, *Commentaries* *75–76 [hereinafter Blackstone]. The petty treasons related to conspiring against one's liege lord, specifically the killing of a husband by his wife, a master by his servant, or a prelate by his subject. Plucknett, at 443; *see* 4 Blackstone, at *75. These petty treasons have since been absorbed into the murder category of felonies and are no longer designated as treasons. *See* 1 Wharton 1857 § 1, at 111. High treason included: plotting the death of the king, queen, or heir; violating the king's wife, his oldest unmarried daughter, or his heir's wife; taking up arms against the king or aiding his enemies; counterfeiting the great seal; counterfeiting money; and slaying the chancellor, treasurer, or judges while sitting in court. 4 Blackstone, at *76–85; Plucknett, at 443. All high treason was punishable by a torturous death. 4 Blackstone, at *92–93.

At common law, the next level of offense down from treason was felony. "All treasons, therefore, strictly speaking, are felonies, though all felonies are not treason." *Id.* at *95. In the middle ages, the list of felonies was short and narrowly defined. Generally, felonies only included "murder, manslaughter, arson, burglary, robbery, rape,

sodomy, mayhem, and larceny." 1 Wharton 1857, § 2, at 112; *see* Plucknett, at 442–51. In English common law, felonies consisted of the crimes that would be punished by "a total forfeiture of either lands or goods, or both, . . . and to which capital or other punishment may be superadded, according to the degree of guilt." 4 Blackstone, at *95. "In this country, with a few exceptions, the common law classification has obtained; the principal felonies being received as they originally existed, and their number being increased as the exigencies of society prompted." 1 Wharton 1857, § 2, at 112.

"Just what the scope of the term *crimen falsi* was seems never to have been accurately defined . . . ." Ralph R. Wood, Note, *Infamy as a Testimonial Disqualification*, 2 Tex. L. Rev. 227, 228 (1924).[4] In the late seventeenth century, the concept of *crimen falsi* began to be used to disqualify witnesses under the theory that the deceit of those convicted rendered them unable to be trusted to testify truthfully. Stuart P. Green, *Deceit and the Classification of Crimes: Federal Rule of Evidence 609(A)(2) and the Origins of* Crimen Falsi, 90 J. Crim. L. & Criminology 1087, 1106 (2000).[5] In 1857, Wharton defined the disqualifying *crimen falsi* as those that both "involve[] the charge of falsehood" and "may injuriously affect the administration of justice, by the introduction of falsehood and fraud." 2 Wharton 1857 § 759, at 416. He proceeded to identify "forgery, perjury, subornation of perjury, suppression of testimony by bribery, conspiracy to procure the absence of a witness, or conspiracy to accuse

---

[4]Wood noted that practically the scope of crimes included in *crimen falsi* had been construed as crimes of a felony grade. Wood, 2 Tex. L. Rev. at 228.

[5]Before the seventeenth century, the *crimen falsi* were primarily forgery and counterfeiting, both of which fell within the treason category and were punished as such, not singled out for punishment based on their deceitful nature. Green, 90 J. Crim. L. & Criminology at 1104–05.

another of crime, and barratry" as the qualifying offenses.  *Id.* (footnotes omitted).[6]

Infamy in the first half of the nineteenth century was understood in two contexts: infamy of the crime and infamy of the punishment.  The infamy of the crime was considered to destroy the competency of the person convicted.  Francis Wharton, *A Treatise on the Criminal Law of the United States* 202 (Phila., James Kay, Jun. & Bro. 1846) [hereinafter Wharton 1846].  It is this type of infamy that led to voter, witness, and juror disqualifications.  Holloway, at 3–4 ("Infamous individuals experienced civil 'degradation'—meaning the loss of the rights of citizenship.").

During the early nineteenth century, many states added provisions to their constitutions excluding persons convicted of infamous crimes from the right of suffrage.  Ohio passed the first infamous-crime exclusion provision in 1803, giving the legislature "full power to exclude from the privilege of electing, or being elected, any person convicted of bribery, perjury, or any other infamous crime."  Ohio Const. of 1803, art. IV, § 4.  Nine other states had added similar restrictions by the time voters approved the Iowa Constitution of 1846.  Ark. Const. of 1836, art. IV, § 12; Fla. Const. of 1838, art. VI, § 4; Ill. Const. of 1818, art. II, § 30; Ind. Const. of 1816, art. VI, § 4; Mo. Const. of 1820, art. III, § 14; N.Y. Const. of 1821, art. II, § 2; R.I. Const. of 1843, art. II, § 4; Tenn. Const. of 1835, art. IV, § 2; Va. Const. of 1830, art. III, § 14.[7]

---

[6]In the 1846 edition of his treatise, Wharton only specified "perjury, forgery, . . . conspiracy, barratry, and the like" as *crimen falsi.*  Francis Wharton, *A Treatise on the Criminal Law of the United States* 201–02 (Phila., James Kay, Jun. & Bro. 1846).

[7]Other states excluded voters based on other variants of criminal conviction.  For example, Connecticut tied electoral privilege forfeiture to conviction of an offense for which an infamous punishment is inflicted rather than an infamous crime.  Conn.

"Persons convicted of treason, felony, piracy, præmunire, perjury, forgery, or any other species of the *crimen falsi,* such as conspiracy, barratry, and the like, [we]re inadmissible" as witnesses. Wharton 1846, at 201–02 (footnotes omitted). Despite this particularized listing, just eleven years later in a subsequent edition of the same treatise, Wharton noted, "[I]t is a difficult point to determine precisely the offences which render the perpetrator of them infamous; the usual and more general enumeration of them being *treason, felony,* and the *crimen falsi.*" 2 Wharton 1857 § 758, at 416. Wharton's definitions are particularly persuasive of the conception of infamous crime at the time of our constitution because the two editions cited here were published the same years as Iowa voters ratified the two versions of the Iowa Constitution.

Overall, the common law reveals that as the concept of democratic governing began to emerge, the concept of infamy took firm hold as a standard utilized to disqualify people from engaging in various civic functions, including voting. Overall, it is fair to conclude the concept of infamous crimes was commonly associated with felony crimes.

**B. Iowa History.** We next review the history of the concept of infamy in Iowa. We begin with our constitution and then separately consider its history in each branch of government.

1. *Constitutional history.* The common law concept of disqualifying a person from voting based on the conviction of an infamous crime

---

Const. of 1818, art. VI, § 3. New Jersey excluded those convicted of crimes that result in the loss of the ability to act as a witness, essentially an infamous-crime provision. N.J. Const. of 1844, art. II, § 1. The term "high crimes and misdemeanors" also appeared in disqualification provisions. *See, e.g.*, Ala. Const. of 1819, art. VI, § 5; Ky. Const. of 1799, art. VI, § 4; La. Const. of 1812, art. VI, § 4.

emerged in Iowa as a part of our first constitution in 1846.[8] The provision was then included in our revised constitution in 1857. As originally enacted, article II, section 5 provided "no idiot, or insane person, or person convicted of any infamous crime, shall be entitled to the privilege of an elector." Iowa Const. art. II, § 5 (repealed 2008). This language remained intact for the next 151 years. In 2008, the section was amended to "remove[] the words 'idiot' and 'insane' from the constitutional provision and substitute[] the phrase 'mentally incompetent to vote.'" *See* Legislative Servs. Agency, *2007 Summary of Legislation*, H.J.R. 3—Proposed Constitutional Amendment—Qualification of Electors (Iowa 2007), https://www.legis.iowa.gov/docs/publications/SOL/401775.pdf. Thus, today, article II, section 5 provides that "a person adjudicated mentally incompetent to vote or a person convicted of any infamous crime shall not be entitled to the privilege of an elector." Iowa Const. art. II, § 5 (ratified 2008).

2. *Legislative history.* Our early territorial laws specifically identified crimes deemed to be infamous. *See* The Statute Laws of the Territory of Iowa, Code of Criminal Jurisprudence, § 109, at 182 (1839) [hereinafter 1839 Statute Laws]. This classification was primarily found in a statute that included crimes such as rape, kidnapping, perjury, arson, burglary, robbery, sodomy, the crime against nature, larceny, forgery, counterfeiting, and bigamy, but did not mention other statutory crimes such as manslaughter, mayhem, assault, false imprisonment, bribery, and fraudulent misrepresentation. *Compare id.*, *with id.* Code of

---

[8]A different version of the clause was originally proposed, disqualifying "persons declared infamous by act of the legislature." Iowa Const. of 1844, art. III, § 5. This provision would be functional as long as the legislature deemed people infamous based on criminal convictions, as done in the 1839 territorial statute. *See* The Statute Laws of the Territory of Iowa, Code of Criminal Jurisprudence, § 109, at 182 (1839).

Criminal Procedure § 92, at 126 (defining felony), *and id.* Code of Criminal Jurisprudence §§ 1–96, at 150–70 (describing various crimes and punishments). Crimes punishable by death—such as murder—were also not included, presumably because the sentence eliminated the need to impose any disqualifications.

While this early legislative history reveals the concept of infamy was swiftly introduced into the culture of Iowa with clarity, the law was short-lived. The infamous-crime statute retreated into legislative obscurity almost as quickly as it surfaced. The territorial legislature repealed the statute in 1843 and did not redefine infamy in a new statute. *See* Revised Statutes of the Territory of Iowa ch. 49, class 2, § 48, at 137 (1843).[9] The concept then essentially lay dormant in the legislative branch of government for over a century and a half, despite its continued prominent presence as a constitutional restriction on voting. During these nearly eight generations of Iowa life, the public attitudes about crime shifted and many new crimes were identified and introduced into our criminal code. *See, e.g.,* Iowa Code § 124.401 (2013) (controlled substances); *id.* § 321J.2 (operating while intoxicated); *id.* ch. 708A (terrorism); *id.* § 710A.2 (human trafficking); *id.* § 715A.8 (identity theft). *Compare* Iowa Code §§ 914–919, 1019–1027 (1919) (prohibiting sale,

---

[9]Instead, the legislature divided crimes into two classes. One class essentially included crimes punishable by incarceration in the penitentiary, and the other class included crimes punishable by fine or incarceration in the county jail. Revised Statutes of the Territory of Iowa ch. 49, §§ 1–75, at 119–30; *id.* ch. 49, class 2, §§ 1–39, at 131–36. It then declared persons convicted of crimes punishable by imprisonment in the penitentiary "to be deemed incompetent to be an elector, juror, or witness" or hold public office. *Id.* ch. 49, § 79, at 131. This approach, however, was effectively preempted by the adoption of the constitution in 1846. Further, in 1849, the legislature adopted an elector-qualifications statute specifying an infamous-crimes conviction disqualified an elector. 1849 Iowa Acts ch. 105, § 1. Yet no elector-qualifications provision was incorporated into the 1851 Iowa Code. *See* Iowa Code §§ 244–261, at 33–35 (1851).

manufacture, possession, transportation, and advertising of liquor, beer, and wine and increasing associated penalties), *with* Iowa Code §§ 1921-f18 to -f37 (1935) (establishing state-run liquor stores and permit systems). Yet through all the years and shifts in our criminal law, the concept of infamy and its disqualification of voters largely remained dormant.

Then, in 1993, Congress passed the National Voter Registration Act of 1993. 52 U.S.C. §§ 20501–20511 (2012). The purpose of the Act was to establish procedures to increase the number of registered voters, enhance voter participation in elections, "protect the integrity of the electoral process," and to ensure current and accurate voter registration lists. *Id.* § 20501. Among the provisions to expand voter registration, the Act established requirements for state voter registration rolls. *Id.* § 20507. Among those requirements was a provision that allowed states to remove the name of a registrant from the list of eligible voters "as provided by State law, by reason of criminal conviction or mental incapacity." *Id.* § 20507(a)(3)(B). This law awoke our legislature to take action to define those criminal convictions that would make a person ineligible to vote.

During the next session of the General Assembly, the Iowa legislature passed an act to implement the National Voter Registration Act. 1994 Iowa Acts ch. 1169 (codified in scattered sections of Iowa Code (1995)). This implementation act disqualified persons convicted of a felony as defined under Iowa Code section 701.7 or a federal felony. *Id.* § 7 (codified at Iowa Code § 48A.6). It also provided for the removal of voters from the registration list by requiring the court to send notice of

convictions to the state registrar of voters. *Id.* § 31 (codified at Iowa Code § 48A.30(1)(*d*)).[10]

The legislature passed a second election law act around the same time with more election and registration laws as well as corrective and technical changes to Iowa's election laws. 1994 Iowa Acts ch. 1180 (codified in scattered sections of Iowa Code). The first provision of this act defined an infamous crime as a felony under section 701.7 or a federal felony, thereby bringing section 48A.6 disqualifications in compliance with the language of article II, section 5 of the Iowa Constitution. *Id.* § 1 (now codified at Iowa Code § 39.3(8) (2013)). The statute meant that convicted felons in Iowa were disqualified from voting. This law enacted by our legislature remains our law today.

3. *Judicial history.* Our court has not had many opportunities to shape the meaning of infamy over the years in the context of voter disqualification. We first discussed the concept of infamous crimes in 1848, two years after we became a state. *See Carter v. Cavenaugh*, 1 Greene 171, 176 (Iowa 1848). However, we did so only in the course of deciding the proper method to impeach a witness who testified at trial. *See id.* at 176–77. In *Carter*, we limited impeachment testimony of a witness to general reputation, not specific crimes. *Id.* at 179. In doing so, we observed the history of disqualifying a witness from testifying. *Id.* at 176–77. We recognized infamous crimes that render a witness incompetent to testify were "the heinous crimes classed as treason, felony, and the *crimen falsi* as understood at common law." *Id.* at 176. We also observed infamous crimes were crimes of moral depravity that

---

[10]A similar provision had previously been in place, canceling the registration of a qualified elector when the clerk of court sent notice of conviction of a felony. Iowa Code § 48.31(4) (1993).

rendered the person incompetent to participate in many aspects of government until pardoned. *Id.*

Over fifty years passed before we again addressed the concept of infamy, but it was once more in the context of the testimony of a witness at trial. In 1901, we noted,

> [T]here has been great difficulty among judges and text writers in stating any satisfactory rule for determining definitely what are the crimes conviction of which disqualifies a witness from testifying. Without controversy, conviction for treason or felony will disqualify, but as to other crimes it has been said that they must be in their nature infamous; and this has been interpreted to include only those crimes involving the element of falsifying, such as perjury or forgery, or other crimes which tend to the perversion of justice in the courts.

*Palmer v. Cedar Rapids & Marion Ry.*, 113 Iowa 442, 446, 85 N.W. 756, 757 (1901).

We next considered the concept of infamy in 1916. In *Flannagan v. Jepson*, 177 Iowa 393, 399–401, 158 N.W. 641, 643–44 (1916), we examined *Ex parte Wilson*, 114 U.S. 417, 429, 5 S. Ct. 935, 941, 29 L. Ed. 89, 93 (1885) (determining that for purposes of the Fifth Amendment, a crime punishable by an infamous punishment like hard labor in a penitentiary is an infamous crime[11]), to determine whether an infamous punishment could be imposed for contempt and ultimately decided that imposition of an infamous punishment requires conviction of a charge triable by jury. However, we inadvertently removed the limiting clause "within the meaning of the [F]ifth [A]mendment" from the

---

[11]The *Wilson* Court expressly distinguished between "crimes subject to any infamous punishment" and "crimes infamous in their nature, independently of the punishment affixed to them," though it allowed that the crimes subject to capital or infamous punishment could also include crimes infamous in nature. *Wilson*, 114 U.S. at 422-24, 5 S. Ct. at 937–38, 29 L. Ed. at 91.

*Wilson* definition of infamous crime and followed the Supreme Court's pronouncement that infamous crime referred to crimes punishable by imprisonment in a penitentiary. *Compare Flannagan*, 177 Iowa at 400, 158 N.W. at 643, *with Wilson*, 114 U.S. at 429, 5 S. Ct. at 941, 29 L. Ed. at 93. This move significantly impacted our development of the concept as applied to voter disqualification in the next infamous-crime case we decided.

In the same year we decided *Flannagan*, we were also presented with a case for the first time that addressed the concept of infamous crimes in the context of qualified electors. In *Blodgett v. Clarke*, 177 Iowa 575, 578, 159 N.W. 243, 244 (1916) (per curiam), *overruled by Chiodo*, 846 N.W.2d at 852, we were required to decide if forgery was an infamous crime that would disqualify an elector from running for public office. We found ourselves squarely confronted with the meaning of infamous crime under article II, section 5 of our constitution and its application to disqualify an elector. *Id.* In considering the question on the heels of *Flannagan*, we wasted no time in holding that an infamous crime was any crime punishable by imprisonment in the penitentiary. *Id.* Our pronouncement closely aligned with the approach taken in *Wilson*. *See id.*; *Flannagan*, 177 Iowa at 400, 158 N.W. at 643. We engaged in no independent analysis and effectively made felonies and infamous crimes synonymous under Iowa law. *See* Iowa Code § 5093 (1897) (defining felony as "a public offense . . . punish[able] by imprisonment in the penitentiary").

We returned to consider the concept of infamy in the context of witness disqualification in *State v. Voelpel*, 208 Iowa 1049, 1050, 226 N.W. 770, 771 (1929). In that case, we distinguished between infamous crimes, crimes of moral turpitude, and felonies:

> We are *not* confronted with the question of whether the previous conviction of a witness must be of "an infamous crime," or one "involving moral turpitude." By statute the proof may be only of "previous conviction for a *felony*." This is one of the methods of impeachment of a witness. It may be true that in ancient times, and under the common law, a witness who had been previously convicted of an "infamous crime" was not permitted to testify at all. However, the law is now more logical and rational in this regard.

*Id.* at 1051, 226 N.W. at 771. Although this language strongly implied a distinction between infamous crime and felony, the nature of that distinction remained unsaid, with the distinction between a witness's disqualification from testifying and the impeachment of the witness instead taking center stage.[12] *See id.*

In 1957, we addressed the concept of infamy in *State ex rel. Dean v. Haubrich*, 248 Iowa 978, 980, 83 N.W.2d 451, 452 (1957). Yet we did not forge any new ground from the path taken in *Blodgett*. *See id.* Rather, we focused on whether a person convicted of an infamous crime could become eligible for elected office by the governor restoring state citizenship rights. *Id.* at 985–86, 83 N.W.2d at 455. As in *Blodgett*, we engaged in no independent analysis of the meaning of infamous crime.

Then, just two years ago, we were required to consider the concept of infamous crimes in the same context we did in *Blodgett* almost a

---

[12]In some cases, we have specifically noted crimes as infamous in nature. *See State v. Pilcher*, 242 N.W.2d 367, 368–69 (Iowa 1976) (sodomy); *State v. Gruver*, 260 Iowa 131, 134, 148 N.W.2d 405, 407 (1967) (forgery); *Kotek v. Bennett*, 255 Iowa 984, 988, 124 N.W.2d 710, 712 (1963) (first-degree murder, under a Fifth Amendment challenge); *State ex rel. Dean v. Haubrich*, 248 Iowa 978, 979–80, 83 N.W.2d 451, 452 (1957) (federal tax evasion); *Blodgett*, 177 Iowa at 578, 159 N.W. at 244 (forgery); *State v. Kingsley*, 39 Iowa 439, 441 (1874) (seduction). However, in each of these cases, the crime was simply noted as an infamous crime, not evaluated to determine whether or why it should be considered infamous. Finally, in *State v. Cullison*, 173 N.W.2d 533, 537 (Iowa 1970), we noted the felon had constitutionally lost his right to vote and hold public office as a result of his felony conviction but did not include which felony he was convicted of that resulted in the loss of the right.

century earlier. *Chiodo*, 846 N.W.2d at 848. In *Chiodo*, as in *Blodgett*, we were asked to determine if a criminal conviction disqualified a person under the voting provision of our constitution from running for public office. *Id.* at 848–49. However, unlike the felony level crime of forgery in *Blodgett*, the crime involved in *Chiodo* was the aggravated misdemeanor of operating while intoxicated, second offense. *Id.* at 849; *Blodgett*, 177 Iowa at 578, 159 N.W. at 244.

For the first time, we engaged in a comprehensive review of our law on infamous crime. *See Chiodo*, 846 N.W.2d at 848–56. In doing so, we discovered that our prior cases never engaged in a textual analysis of the meaning of infamous crime in article II, section 5 of our constitution. *See id.* at 849–51. The plurality opinion rejected the *Blodgett* standard that broadly defined infamous crimes as any crime punishable by imprisonment in the state penitentiary. *Id.* at 852. It also rejected the notion of infamy as a criminal punishment and concluded that our founders viewed the concept more as a regulatory measure intended to "preserve the integrity of the process of voting" and to protect the process from those "infected by an infamous disposition." *Id.* at 855. Although we identified various tests used in other states to determine if a crime was infamous—affront to democratic governance, the common law definition, or crimes of great moral turpitude—we declined to adopt any of them at that time. *Id.* at 856. Instead, we only utilized two criteria: the crime "must be classified as particularly serious" and "must . . . reveal[] that voters who commit the crime would tend to undermine the process of democratic governance through elections." *Id.* We held that to meet the first criterion, a particularly serious nature, the crime must be a felony, not a misdemeanor. *Id.* at 856–57.

4. *Executive history.* With the absence of a statute governing the disqualification of voters for convictions of infamous crimes in almost all but the last two decades of our statehood, little history of executive branch enforcement of the constitutional provision governing voter disqualification exists in Iowa. Yet cases like *Blodgett* and *Haubrich* would not have made it to our court if the executive branch had not been implementing the disqualification of otherwise eligible electors convicted of committing infamous crimes. Moreover, *Haubrich* provides evidence that governors over the years have used the pardoning power to restore elective rights to convicted persons. *See* 248 Iowa at 985–86, 83 N.W.2d at 455–56. Overall, the restoration of voting rights of convicted felons who have completed their sentences provides the most significant history of executive branch action, particularly in recent times.

The last decade has revealed two different approaches by the executive branch to the restoration of voting rights through the exercise of the power to pardon. On July 4, 2005, Governor Thomas J. Vilsack signed Executive Order No. 42. Exec. Order No. 42 (2005), http://publications.iowa.gov/3762/1/EO_42.pdf. This order restored the citizenship rights—including voting rights and eligibility for public office—for "all offenders that are completely discharged from criminal sentence, including any accompanying term of probation, parole, or supervised release." *Id.* It further provided that eligible offenders would automatically be reviewed to determine whether to restore their rights when their sentences were discharged. *Id.* The order was rescinded on January 14, 2011, by Governor Terry E. Branstad. Exec. Order No. 70 (2011), http://publications.iowa.gov/10194/1/BranstadEO70.pdf. Currently, offenders who have discharged their sentences are required to go through an application process before their voting rights may be

restored.  *Id.*  Each application is then considered on a case-by-case basis by the governor's office.

In addition to an executive branch history of restoring voting rights through the exercise of the power to pardon, the history of the executive branch also includes opinions from the office of the Iowa Attorney General discussing infamous crimes, disqualification, and the restoration of rights.  An early opinion concluded that the restoration of rights was incident to the governor's constitutional power to pardon and that a restoration could not happen without the right to pardon.  Op. Iowa Att'y Gen. (Nov. 17, 1898), 1898 WL 37740, at *1.  In 1912, an advisory opinion written to then-Governor B.F. Carroll noted that the disqualification provision was not limited to state convictions and that an infamous crime in state or federal court fell within the scope of article II, section 5 of the Iowa Constitution.  Op. Iowa Att'y Gen. (Oct. 16, 1912), 1912 WL 49029, at *1 (opining the governor had the right to restore state citizenship rights regardless of jurisdiction of conviction).  A 1924 opinion stated that a convict (other than one guilty of treason or in a case of impeachment) that had discharged his sentence and received a certificate of restoration "is restored to the same position in which he was before his conviction and is therefore, restored to the privileges of an elector."  Op. Iowa Att'y Gen. (Mar. 8, 1924), 1924 WL 60500, at *2.  In 1936, the attorney general's office expressly linked the restoration to a pardon and noted that the rights of citizenship cannot be enjoyed following a conviction "until and unless" a restoration is granted.  Op. Iowa Att'y Gen. (Apr. 13, 1936), 1936 WL 68639, at *2.

In 1957, the attorney general concluded the governor was "the sole judge as to what conditions must be met before such restoration may be procured" and that the power to restore rights rested exclusively in the

Office of the Governor. Op. Iowa Att'y Gen. (May 20, 1957), 1957 WL 93124, at *1. In 1964, the attorney general informed the governor that his power to restore Iowa citizenship rights extended to those convicted in other states, unless they had already been pardoned in that other state. Op. Iowa Att'y Gen. (June 9, 1964), 1964 WL 121187, at *2.

The legislature consulted with the attorney general in 1976 when amending the election-related criminal penalties. *See* Op. Iowa Att'y Gen. No. 76-3-7 (Mar. 11, 1976), 1976 WL 375888, at *1. First, the attorney general found that under the then-current Iowa court precedent, aggravated and serious misdemeanors would fall within the category of infamous crimes based on the penitentiary punishment proposed. *Id.* at *2. Second, the attorney general concluded that a statutory provision restoring elective rights following discharge would both violate the elector requirements of article II, section 5 of the Iowa Constitution and infringe on the pardoning powers of the executive branch. *Id.* at *3–4. This was the approach followed by the dissenting opinion in *Chiodo.* *See* 846 N.W.2d at 863–65 (Wiggins, J., dissenting).

The final useful guidance from the attorney general's office was directed to the Iowa Voter Registration Commission in 1985 regarding the application of statutes implementing article II, section 5 of the Iowa Constitution. Op. Iowa Att'y Gen. No. 85-6-7(L) (June 19, 1985), 1985 WL 549204, at *1. The opinion observed that the courts had not fully considered the term "infamous crime" since 1916 in *Flannagan.* *Id.* at *3. It found the year-or-more-confinement formulation of the term stated in *Flannagan* and *Haubrich* to be problematic, questioning whether that formulation would withstand judicial review, but concluded that the executive branch was bound to it. *Id.* at *3–4.

As a whole, the history of the executive branch of government provides more insight into the debate over the restoration of voting rights than the debate over what crimes should result in the loss of voting rights. However, the debate over the restoration of rights after completing the sentence is separate and distinct from the debate over the types of crime that should be considered infamous and does not influence the meaning of infamy.

**C. Application of Infamy in Contexts Other Than Voting.** This historical background serves not as the end, but as the beginning point in our analysis. One author explains that those convicted of infamous crimes have breached the civic trust and that regaining the right to vote serves as the relevant currency signaling the breaching party once again meets the standards of society and has been restored to that civic trust. Mary Sigler, *Defensible Disenfranchisement*, 99 Iowa L. Rev. 1725, 1728, 1736–38 (2014). This concept relates to social-contract theories that suffrage protects citizens from misrule and requires them to not harm each other. *See id.* at 1736–38 (examining the topic of "civic trust" and its application to the electoral process); *see also* Alec C. Ewald, *"Civil Death": The Ideological Paradox of Criminal Disenfranchisement Law in the United States*, 2002 Wis. L. Rev. 1045, 1073–78 (examining the relation of principles from John Locke, Thomas Paine, and Alexis de Tocqueville to American attitudes toward criminals). Under this theory, those who harm others or society through criminal action would exercise the right to vote in a way to harm society. Although society believes in the rehabilitation of offenders and attitudes toward those who have discharged their sentences have evolved considerably, we must determine societal attitudes toward those still under sentence as well as those with completed sentences. Attitudes might be changing to

recognize that those convicted of infamous crimes can be trustworthy and valuable electors, but the premise of at least some disqualification based on conviction still appears to have general acceptance throughout the country.[13]

As mentioned above, under English common law, those convicted of infamous crimes were barred from testifying because they were considered incompetent. 3 Blackstone, at *370 ("Infamous persons are such as may be challenged as jurors, *propter delictum* (on account of incompetency) and therefore never shall be admitted to give evidence to inform that jury, with whom they were too scandalous to associate."). The nature of the crime, not the potential for infliction of an infamous punishment, provided the ground for incompetency. 2 William Oldnall Russell, *A Treatise on Crimes and Indictable Misdemeanors* 593 (Theron Metcalf ed., 2d Am. ed., Phila., P.H. Nicklin & T. Johnson 1831). This practice of disqualifying those convicted of infamous crimes from testifying in court was already changing by the time our constitution was ratified. *See* George Fisher, *The Jury's Rise as Lie Detector*, 107 Yale L.J. 575, 656–71 (1997) (tracing the fall of competency rules governing felon testimony in civil and criminal cases).

As early as 1848, our court expressed doubt of the link between truthfulness and character as applied to witness testimony. *See Carter*, 1 Greene at 176–77. By 1851, our statutes allowed "[f]acts which have heretofore caused the exclusion of testimony" to be admitted to lessen credibility, but the testimony of those convicted of felonies was

---

[13]Only two states, Maine and Vermont, do not impose any voting restrictions or disenfranchise voters for criminal conviction. *See Criminal Disenfranchisement Laws Across the United States*, Brennan Ctr. for Justice (May 31, 2016), http://www.brennancenter.org/sites/default/files/publications/Criminal_Disenfranchisement_Map.pdf.

permitted. Iowa Code §§ 2389, 2398 (1851). In 1892, the Supreme Court observed that barriers excluding witnesses had been falling:

> [I]t is generally, though perhaps not universally, true that no one is excluded [from testifying] unless the lips of the originally adverse party are closed by death, or unless some one of those peculiarly confidential relations, like that of husband and wife, forbids the breaking of silence.

*Benson v. United States*, 146 U.S. 325, 337, 13 S. Ct. 60, 64, 36 L. Ed. 991, 996 (1892). This movement continued and was reinforced by the Court in 1918, "leaving the credit and weight of such testimony to be determined by the jury or by the court, rather than by rejecting witnesses as incompetent." *Rosen v. United States*, 245 U.S. 467, 471, 38 S. Ct. 148, 150, 62 L. Ed. 406, 409 (1918). The *Rosen* Court noted the extension reached those convicted of perjury, even though perjury reflected "a greater disregard for the truth than it was thought should be implied from a conviction of other crime." *Id.*

Today the federal and state rules of evidence allow impeachment of a witness for conviction of a crime punishable by death or imprisonment of a year or more or for conviction of a crime involving dishonesty or false statement; the rules do not disqualify witnesses from testimony based on any crimes. Fed. R. Evid. 609(a); Iowa R. Evid. 5.609(a). While the admissibility of most convictions for impeachment purposes is subject to a rule 5.403 balancing of the probative nature of the conviction versus its prejudicial value, crimes involving dishonesty and false statement—i.e. the *crimen falsi*—are not subject to discretionary exclusion. *State v. Harrington*, 800 N.W.2d 46, 49–51 (Iowa 2011). However, the rule places a time limit on either form of impeachment: ten years from the later of the date of conviction or the date of release from confinement. Fed. R. Evid. 609(b); Iowa R. Evid. 5.609(b).

Conviction of an infamous crime disqualified a person from serving as a juror for considerably longer than the testimonial disqualification. In 1851, only qualified electors "of good moral character [and] sound judgment" could be competent jurors. Iowa Code § 1630. As article II, section 5 of the Iowa Constitution expressly excepted those convicted of infamous crimes from being an elector, the statute had the effect of disqualifying every person convicted of an infamous crime from jury service. This "qualified elector" requirement remained the law in Iowa until 1984. 1984 Iowa Acts ch. 1181, § 2 (repealing Iowa Code § 607.1 (1983) (juror qualifications)). The replacement qualifications no longer required status as a qualified elector and did not otherwise disqualify a person from jury service based on a conviction. *See id.* § 3 (codified at Iowa Code § 607.2 (1985)). Jury lists were no longer a selection of eligible electors derived from lists of registered voters *or* drivers' license holders, but instead became a selection of those qualified for service taken from a combined list of voters, drivers' license holders, *and* public utility customers. *Compare* Iowa Code § 609.5 (1983), *with* Iowa Code § 609.5 (1985).

The court ceased invalidating verdicts from juries that included a disqualified juror much earlier in time than the jury service disqualification ended. In 1860, we held that a defendant waives any objection to a juror's bias or prejudice when the jury is accepted at the beginning of trial, but objections to any disqualified persons sitting as jurors are not waived and provide the defendant a right to a new trial. *State v. Groome*, 10 Iowa 308, 316 (1860) ("We think it is the duty of the State to place twelve legal jurors in the box, and that it is not the duty of defendant to inquire whether the jurors are qualified or not."), *overruled*

*in part by State v. Pickett,* 103 Iowa 714, 720, 73 N.W. 346, 347 (1897).

This idea was expressly overruled in 1897, when we held,

> There is no reason why every party to an action, civil or criminal, should not be held to exercise the right given him to examine as to the qualifications of jurors called to act in his case, and, if he waives that right, to be concluded thereby, unless actual prejudice is otherwise shown.

*Pickett,* 103 Iowa at 720, 73 N.W. at 347. Thus, both parties would bear the burden of ensuring the jurors were competent to sit on the jury, and a juror incompetent due to a conviction would no longer invalidate a verdict without the defendant showing that juror's presence had prejudiced the verdict. *Id.* Unlike with testimony impeachment, however, some states continue to disqualify jurors based on conviction of infamous crime. *See, e.g.,* Miss. Code Ann. § 13–5–1 (West, Westlaw through 2016 Reg. Sess. effective through May 17, 2016) ("Every citizen . . . who . . . has not been convicted of an infamous crime . . . is a competent juror.").

Overall, we left the concept of infamy behind in the context of disqualifying a witness from testifying.[14] More recently, we ceased to use it to disqualify jurors. Yet these divergent paths did not change the

---

[14]Significantly, the 1846 Constitution had provided only that "no person shall be . . . rendered incompetent to give evidence in any court of law or equity, in consequence of his opinions on the subject of religion." Iowa Const. of 1846, art. II, § 3. In 1857, the following language was added: "[A]nd any party to any judicial proceeding shall have the right to use as a witness, or take the testimony of, any other person not disqualified on account of interest, who may be cognizant of any fact material to the case . . . ." Iowa Const. art. I, § 4. Thus, "interest" seemingly became the only basis for disqualifying a witness.

In fact, the delegates to the 1857 convention voted down an amendment that would have authorized "persons convicted of infamous crimes" to be prevented from testifying. 1 *The Debates of the Constitutional Convention of the State of Iowa* 180 (W. Blair Lord rep., 1857), www.statelibraryofiowa.org/services/collections/law-library/iacon/iadeb/condebs. But at the same time, our framers retained the language disqualifying persons convicted of infamous crimes from *voting.*

definition of infamous crime in the context of voter disqualification, and they do not undermine our analytical model of relying on community standards of today to define an infamous crime. Prevailing community standards remain important in defining infamous crimes, whether those standards might serve to exclude some felony crimes from the definition or include all felony crimes. Community standards are properly used to define constitutional doctrine unless constitutional facts exist that reveal the standards are contrary to the intent and purpose of the constitutional doctrine.

## VII. Application.

As we strive today to identify a standard of infamy, it is clear our history reveals the infamous crime disqualification from voting was introduced to Iowa as a concept aligned with the common law notion of infamy. This common law approach generally identified infamous crimes as felonies. *See Carter*, 1 Greene at 176. Yet the concept of infamy was not carried forward with a specific or strict definition, but rather as a general principle dependent on time for its development. This is what history has shown has been taking place from the time the concept of infamy originated. The difficulty today is that the three branches of government, and therefore the State of Iowa, have done little to advance the concept.

Our territorial legislature briefly expressed—and quickly withdrew—the view that infamous crimes included many, but not all, crimes that today would be described as felonies. *See* 1839 Statute Laws § 109, at 182; Revised Statutes of the Territory of Iowa ch. 49, class 2, § 48, at 137. Then, in 1994, our legislature took the concrete step to expound a bright-line standard that infamous crime embraces all

felonies. 1994 Iowa Acts ch. 1180, § 1 (now codified at Iowa Code § 39.3(8) (2013)).

Under our analytical model, these legislative pronouncements are important considerations for us today. Statutes do not serve as constitutional definitions but provide us the most reliable indicator of community standards to gauge the evolving views of society important to our analysis. *State v. Bruegger*, 773 N.W.2d 862, 873 (Iowa 2009); *see Chiodo*, 846 N.W.2d at 853–54 (plurality opinion). These views are particularly invaluable in interpreting the infamous-crime clause in Iowa. *See Chiodo*, 846 N.W.2d at 854.

The judgment expressed by the legislature in 1994 has additional importance in this case in light of the absence of other legislative or judicial expressions in our state's history. For sure, the legislative view of infamy has indirectly modified over time as various statutes on crime expanded and contracted, but only slightly. For example, sodomy was declared by our territorial legislature to be among the infamous crimes in 1839, and it remained a crime well into the twentieth century. Iowa Code ch. 705 (1977); 1839 Statute Laws § 109, at 182. Today, it is no longer a crime—the criminal provision was repealed in 1978. *See* 1976 Iowa Acts ch. 1245, ch. 4, §§ 526, 529. Bigamy was also declared an infamous crime in 1839. 1839 Statute Laws § 83, at 173–74; *id.* § 109, at 182. It was punishable by imprisonment in the penitentiary, and this harsh punishment continued well into the twentieth century. *Id.* § 83, at 174; Iowa Code § 703.1 (1977). Today, it is only considered a serious misdemeanor. Iowa Code § 726.2 (2013). Thus, the scope of infamy associated with criminal acts has evolved as our view of criminal culpability evolved. Yet these modest changes to our view of crime over time did not knock the concept of infamy out of line with the concept of

felony. To the contrary, infamy remained remarkably consistent with its historic connection to felonies over the passage of time.

Moreover, the definition is not out of line with the national view of infamy in the context of voter disqualification. Certainly, no national consensus has developed to define infamous crime either more broadly or more narrowly than our legislature. As we recognized in *Chiodo*, many states across the nation have included provisions in their constitutions to deny people the right to vote when convicted of an infamous crime.[15] 846 N.W.2d at 855. Regarding those states, we observed,

> Some courts have settled on a standard that defines an "infamous crime" as an "affront to democratic governance or the public administration of justice such that there is a reasonable probability that a person convicted of such a crime poses a threat to the integrity of elections." Other courts limit the definition to a "felony, a *crimen falsi* offense, or a like offense involving the charge of falsehood that affects the public administration of justice." Still other courts establish the standard at crimes marked by "great moral turpitude."

*Id.* at 856 (citations omitted) (first quoting *Snyder v. King*, 958 N.E.2d 764, 782 (Ind. 2011); then quoting *Commonwealth ex rel. Baldwin v. Richard*, 751 A.2d 647, 653 (Pa. 2000); and then quoting *Washington v. State*, 75 Ala. 582, 585 (1884)).

Some states define infamous crimes using an itemized list of crimes, some have adopted versions of the common law definition, some limit the definition to felonies—either specific offenses or all felonies— and some define it based on the punishment inflicted. *See, e.g.*, Ark. Code Ann. § 7-1-101(17) (West, Westlaw through 3d Extraordinary Sess.,

---

[15]The other states that still have suffrage infamous-crimes clauses in their constitutions are Indiana, Maryland, New Mexico, New York, Tennessee, and Washington. Ind. Const. art. II, § 8; Md. Const. art. I, § 4; N.M. Const. art. VII, § 1; N.Y. Const. art. II, § 3; Tenn. Const. art. IV, § 2; Wash. Const. art. VI, § 3.

90th Ark. Gen. Assemb. in effect May 23, 2016) (felony, misdemeanor theft or fraudulent/deceitful act, abuse of office, tampering); Miss. Code Ann. § 1-3-19 (offenses punishable by death or confinement in penitentiary); Tenn. Code Ann. § 40-20-112 (West, Westlaw through the 2016 2d Reg. Sess. effective through Mar. 24, 2016) (any felony with infamous adjudication); *In re Request of Governor for Advisory Opinion*, 950 A.2d 651, 653 (Del. 2008) ("[T]he totality of the circumstances in each case must be examined before a determination may be made that a specific felony is infamous." (quoting *State ex rel. Wier v. Peterson*, 369 A.2d 1076, 1079 (Del. 1976))); *Cure v. State*, 26 A.3d 899, 913 (Md. 2011) ("Infamous crimes include treason, common law felonies, and other offenses classified generally as *crimen falsi*." (quoting *State v. Westpoint*, 947 A.2d 519, 532 (Md. 2008))).

Additionally, when a state constitutional provision relating to voting or the holding of public office uses the term "infamous crime," it has usually been interpreted to include all felonies. *See Washington*, 75 Ala. at 585 ("The presumption is, that one rendered infamous by conviction of felony, or other base offense indicative of great moral turpitude, is unfit to exercise the privilege of suffrage, or to hold office . . . ."); *State v. Oldner*, 206 S.W.3d 818, 821 (Ark. 2005) (holding "Arkansas courts have consistently recognized that a person convicted of a felony or one of the specifically enumerated offenses is disqualified from holding public office" under a provision of the Arkansas Constitution that applies to persons convicted of "embezzlement of public money, bribery, forgery, or other infamous crime" (quoting Ark. Const. art. V, § 9)); *People ex rel. Keenan v. McGuane*, 150 N.E.2d 168, 176 (Ill. 1958) ("Accordingly, we conclude that any public officer convicted, in the Federal court or in the court of any sister State, of a felony which falls

within the general classification of being inconsistent with commonly accepted principles of honesty and decency, or which involves moral turpitude, stands convicted of an infamous crime under the common law as interpreted when our constitution was adopted in 1870, and that such conviction creates a vacancy in such office."); *State v. Bixler*, 62 Md. 354, 360 (1884) ("The Constitution in providing for exclusion from suffrage of persons whose character was too bad to be permitted to vote, could only have intended, by the language used, such crimes as were 'infamous' at common law, and are described as such in common law authorities. . . . It must be a *felony* . . . or that which is *infamous* though it be not a felony."); *Mauney v. State ex rel. Moore*, 707 So. 2d 1093, 1095 (Miss. 1998) (adopting the statutory definition of infamous crime as the constitutional definition for disqualification from public office and declaring that " 'infamous crime' includes all felonies"); *Barker v. People*, 20 Johns. 457, 460 (N.Y. Sup. Ct. 1823) ("The law has settled what crimes are infamous; they are treason, felony, and every species of the *crimen falsi*, such as perjury, conspiracy and barratry."); *Briggs v. Bd. of Cty. Comm'rs*, 217 P.2d 827, 829 (Okla. 1950) ("It is correctly conceded that a felony under the laws of this State is an infamous crime."); *Baldwin*, 751 A.2d at 653 ("[W]e reaffirm that a crime is infamous . . . if its underlying facts establish a felony, a *crimen falsi* offense, or a like offense involving the charge of falsehood that affects the public administration of justice."); *State v. Collins*, 124 P. 903, 904–05 (Wash. 1912) (finding that when the defendant was convicted of "breaking jail" in Missouri and then charged with illegally registering to vote in Washington because he had been previously convicted of an "infamous crime," the information "does not state whether he was then charged with a felony or a misdemeanor under the laws either of that state or of

this [and therefore] [i]t is clear that the information thus failed to state facts which under the present law of this state would necessarily constitute an infamous crime"); *Becker v. Green County*, 184 N.W. 715, 717 (Wis. 1921) ("While there has been much debate as to what constitutes an infamous crime, we think . . . it is now deemed to mean . . . a crime punishable by imprisonment in the state prison."); *Isaacs v. Bd. of Ballot Comm'rs*, 12 S.E.2d 510, 511 (W. Va. 1940) ("An offense punishable by death or penitentiary confinement is a felony. And, generally, felonies are deemed infamous crimes." (Citation omitted.)).

We readily recognize not all courts have interpreted infamous crime to include all felonies. In *People v. Enlow*, the Colorado Supreme Court interpreted a Colorado statute declaring a county office vacant upon the incumbent's conviction of an infamous crime. 310 P.2d 539, 541 (Colo. 1957) (en banc). The court observed that in Colorado, "all infamous crimes are felonies, but not all felonies are infamous crimes" and determined that federal tax evasion was not an infamous crime. *Id.* at 544–47. However, the court expressly relied on another Colorado statute that provided a specific list of infamous crimes that did not include tax evasion. *Id.* at 545–46. The situation here is different. We are interpreting a constitutional infamous-crime provision that is backstopped by a different legislative definition.

In *Wier*, the Delaware Supreme Court interpreted a provision of the Delaware Constitution banning persons from holding public office who had been convicted of "embezzlement of the public money, bribery, perjury or other infamous crime." 369 A.2d at 1078 n.3 (quoting Del. Const. art. 2, § 21). The court said that "not . . . *every* felony is necessarily a crime of infamy" and "the totality of the circumstances in each case must be examined before a determination may be made that a

specific felony is infamous." *Id.* at 1079. On the facts, the court found that a convicted rapist had committed an infamous crime. *Id.*

In *Snyder*, the Indiana Supreme Court held that "an infamous crime is one involving an affront to democratic governance or the public administration of justice such that there is a reasonable probability that a person convicted of such a crime poses a threat to the integrity of elections." 958 N.E.2d at 782. In embracing the "affront to democratic governance" standard, however, the Indiana Supreme Court relied heavily on a 1966 California decision, *Otsuka v. Hite*, 414 P.2d 412, 414 (Cal. 1966) (en banc), *abrogated by Ramirez v. Brown*, 507 P.2d 1345 (Cal. 1973) (en banc). *See Snyder*, 958 N.E.2d at 781–82. *Otsuka*'s analysis was driven by an interpretation of the Fourteenth Amendment that has since been overruled by the United States Supreme Court. *Compare Otsuka*, 414 P.2d at 422–23, *with Richardson v. Ramirez*, 418 U.S. 24, 54–55, 94 S. Ct. 2655, 2671, 41 L. Ed. 2d 551, 571 (1974).

In *Otsuka*, the California Supreme Court limited the scope of California's infamous-crimes provision to crimes involving an affront to democratic governance to avoid what it believed was a conflict with the Equal Protection Clause of the Fourteenth Amendment. *Otsuka*, 414 P.2d at 422–23. However, a few years later, the United States Supreme Court undermined the jurisprudential basis for *Otsuka* when it held that felon disenfranchisement is not subject to strict scrutiny because it "has an affirmative sanction in s[ection] 2 of the Fourteenth Amendment, a sanction which was not present in the case of the other restrictions on the franchise which were invalidated in the cases on which respondents rely." *Richardson*, 418 U.S. at 54, 94 S. Ct. at 2671, 41 L. Ed. 2d at 571. In 2011, the *Snyder* court discussed *Otsuka* at length and relied on it, but without referring to its Fourteenth Amendment underpinnings or

what happened to those underpinnings in *Richardson*. *See Snyder*, 958 N.E.2d at 781–82.

Notwithstanding, no objective evidence exists that the founders of our Iowa Constitution adopted or intended to adopt a concept of infamy restricted to those crimes that undermine the integrity of the election process or any comparable standard, or that our state evolved to embrace such a standard at any time in our history. In *Chiodo*, we indicated infamous crime as a disqualification from voting was a means to avoid undermining the integrity of elections. 846 N.W.2d at 855–56. This observation did not establish a standard, but identified a broad rationale for the constitutional provision. *See id.* A standard must still exist, and a standard based on felonies is not necessarily inconsistent with the rationale of upholding the integrity of elections. The bottom line is that throughout history the concept of infamous crime may have included crimes in addition to felonies, but it always included felonies or crimes that would be classified as felonies today.

It is also important to observe that in the generation that has passed since the 1994 statute, there has been no objective public sign or movement to redefine infamy as the disqualifying standard—until this case. Even *Chiodo* came to us as an isolated action by a candidate for public office to disqualify his opposing candidate because of a prior conviction for the crime of operating while intoxicated. *Id.* at 847. Instead, the public discourse in Iowa since the 1994 legislative enactment has essentially been limited to the issue of reinstating voting rights after a felon has discharged his or her sentence, as shown by the

actions of our last three governors. No public action has been formally taken to limit the felonies considered to be infamous crimes.[16]

In interpreting our constitution, we must confine our analysis to the history we have been given and the evidence and facts as they exist. At times, this required approach has allowed us to expand constitutional rights beyond what previously existed. *See Varnum v. Brien*, 763 N.W.2d 862, 883–84 (Iowa 2009) (finding same-sex and opposite-sex couples to be similarly situated for purposes of marriage laws). But these times occur when the evidence and understanding of today clearly supports the result. *See id.* at 889–96 (examining evidence regarding homosexuality, marriage, and children).

We observe some evidence from social science professionals and other experts that identify problems associated with the disenfranchisement of voters, including convicted felons. *See* Regina Austin, *"The Shame of It All": Stigma and the Political Disenfranchisement of Formerly Convicted and Incarcerated Persons*, 36 Colum. Hum. Rts. L. Rev. 173, 182–84 (2004) (discussing the effect of incarceration on the voting and political power of ex-offenders, their families, and their communities); Atiba R. Ellis, *Tiered Personhood and the Excluded Voter*, 90 Chi.-Kent L. Rev. 463, 476 (2015) ("[D]isenfranchisement concerning formerly incarcerated felons makes those felons unequal to other citizens

---

[16]In 2007, the general assembly adopted new election-related legislation. *See* 2007 Iowa Acts ch. 59 (codified in scattered sections of Iowa Code (2009)). This legislation provided, among other things, that a voter could be challenged on the ground that he or she "has been convicted of a felony, and the person's voting rights have not been restored." *Id.* § 12 (codified at Iowa Code § 49.79(2)(*f*)).

To the present day, every member of the general assembly must file an affidavit of candidacy as a condition of running for office. The affidavit recites that the candidate knows she or he cannot run for office if she or he has been convicted of a "felony or other infamous crime." Iowa Code § 43.18(9) (2013).

within the political community."); Brian Pinaire, Milton Heumann & Laura Bilotta, *Barred from the Vote: Public Attitudes Toward the Disenfranchisement of Felons*, 30 Fordham Urb. L.J. 1519, 1540–41 (2003) (discussing survey findings of Americans' attitudes toward the voting rights of felons, concluding 81.7% of those surveyed were in favor of restoration of voting rights, but noting only 9.9% felt felons should never lose the right to vote). The amici curiae also raised concerns regarding the permanent nature of disenfranchisement under the constitution, our statutes, and the current administrative restoration process. This evidence, however, falls far short of identifying objective community standards of infamy and does not illuminate the meaning of infamous crimes today. It also does not carry the weight needed to undermine the legislative judgment expressed in 1994 to include all felonies as infamous crimes.

We also observe the presence of a growing movement in our country and state that emphasizes the purpose of rehabilitation and the need to reintegrate into society those who have served their sentences through the restoration of citizenship rights. Yet the restoration of voting rights is a different issue from the definition of those crimes that result in disqualification and is not before us.

Finally, we acknowledge that voter disqualification based on criminal convictions has a disproportionate impact on voting rights of African Americans and perhaps other groups in society. Yet this outcome is tied to our criminal justice system as a whole and is not isolated to the use of the infamous-crime standard. Racial disparity must be eliminated in society, but its unwanted presence does not necessarily undermine the concept or current definition of infamous crime as a standard for voter disqualification. Moreover, no evidence

suggests this state adopted or maintained infamy to discriminate against minority groups.

We also reject Griffin's claim that her crime of conviction is not infamous because it was not associated with violence. Infamy has never required a violent act. Additionally, the history of Griffin's crime does not support its exclusion from the concept of infamy. In fact, it has historically been viewed to be a more serious crime.

The unlicensed, unprescribed sale or other distribution of cocaine has been illegal in the State of Iowa since 1902. *See* 1902 Iowa Acts ch. 110 (codified at Iowa Code §§ 2596-a to -c (1902 Supp.)). In the early 1900s, cocaine was treated the same as other narcotic drugs and could be prescribed for medical purposes by a physician or dentist. Iowa Code § 2596-a. Punishment for violation of the Act—unprescribed or unlicensed distribution—only resulted in a fine for a first offense, then up to three months in jail for a subsequent offense. *Id.* § 2596-b. The punishment changed in 1924, when the regulation of the sale and distribution of narcotic drugs was expanded. *See* Iowa Code §§ 3151–3155, 3168 (1924). At that point, the possession or sale of any narcotic, including cocaine, without a prescription or license became a felony and was punishable by imprisonment in the penitentiary for up to ten years. *Id.* §§ 3151–3154, 3168, 12890. Moreover, the delivery of cocaine is criminal in all fifty states as well as under federal law.[17]

---

[17]*See* 21 U.S.C. § 841; Ala. Code § 13A–12–231 (West, Westlaw through Act 2016–376 of 2016 Reg. Sess.); Alaska Stat. Ann. § 11.71.030 (West, Westlaw through 2016 2d Reg. Sess. of 29th Leg.); Ariz. Rev. Stat. Ann. § 13-3408 (West, Westlaw through legis. effective May 17, 2016 of 2d Reg. Sess. of 52d Leg.); Ark. Code Ann. § 5–64–422; Cal. Health & Safety Code § 11352 (West, Westlaw through urgency legis. through chapter 22 of 2016 Reg. Sess.); Colo. Rev. Stat. Ann. § 18–18–405 (West, Westlaw current through Apr. 22, 2016 of 2d Reg. Sess. of 70th Gen. Assemb.); Conn. Gen. Stat. Ann. § 21a–277 to –278 (West, Westlaw through Pub. Acts effective June 7, 2016); Del. Code Ann. tit. 16, §§ 4752–4754 (West, Westlaw through 80 Laws 2016,

Delivery of cocaine is not a new felony, and its classification and associated punishment have not been found disproportional to the offense committed. Nor is it an offense that is a felony in some states

chapter 243); D.C. Code Ann. § 48–904.01 (West, Westlaw through May 11, 2016); Fla. Stat. Ann. § 893.135(1)(b) (West, Westlaw through chapters from 2016 2d Reg. Sess. of 24th Leg.); Ga. Code Ann. §§ 16–13–30 and –31 (West, Westlaw through 2016 Reg. Sess. of Ga. Gen. Assemb.); Haw. Rev. Stat. Ann. § 712–1241 (West, Westlaw through Act 51 of 2016 Reg. Sess.); Idaho Code Ann. § 37–2732 (West, Westlaw through ch. 47 of 2016 2d Reg. Sess. of 63d Idaho Leg.); 720 Ill. Comp. Stat. Ann. 570/401 (West, Westlaw through P.A. 99–506 of 2016 Reg. Sess.); Ind. Code Ann. § 35-48-4-1 (West, Westlaw through 2016 2d Reg. Sess. of 119th Gen. Assemb.); Kan. Stat. Ann. § 21–5705 (West, Westlaw through 2016 Reg. Sess.); Ky. Rev. Stat. Ann. § 218A.1412 (West, Westlaw through 2016 Reg. Sess.); La. Stat. Ann. § 40:967 (West, Westlaw through 2016 1st Extraordinary Sess.); Me. Rev. Stat. Ann. tit. 17-A, § 1103 (West, Westlaw through 2015 2d Reg. Sess. of 127th Leg.); Md. Code Ann., Crim. Law § 5–602 (West, Westlaw through 2016 Reg. Sess. of Gen. Assemb.); Mass. Gen. Laws Ann. ch. 94C, § 32A (West, Westlaw through ch. 115 of 2016 2d Ann. Sess.); Mich. Comp. Laws Ann. § 333.7401 (West, Westlaw through P.A.2016, No. 146, of 2016 Reg. Sess., 98th Leg.); Minn. Stat. Ann. §§ 152.021–.023 (West, Westlaw through 2016 Reg. Sess.); Miss. Code Ann. § 41–29–139; Mo. Ann. Stat. § 195.211 (West, Westlaw through 2016 2d Reg. Sess. of 98th Gen. Assemb.); Mont. Ann. Stat. §§ 45–9–101, –102 (West, Westlaw through 2015 Sess.); Neb. Rev. Stat. Ann. § 28–416 (West, Westlaw through 2d Reg. Sess. of 104th Legis.); Nev. Rev. Stat. Ann. § 453.3395 (West, Westlaw through 78th Reg. Sess. and 29th Special Sess.); N.H. Rev. Stat. Ann. § 318-B:26 (West, Westlaw through ch. 160 of 2016 Reg. Sess.); N.J. Stat. Ann. § 2C:35–5 (West, Westlaw through L. 2016, c. 4); N.M. Stat. Ann. § 31–31–20, (West, Westlaw through 2d Reg. Sess. of 52d Leg. (2016) in effect by May 18, 2016); N.Y. Penal Law §§ 220.06, .16 (McKinney, Westlaw through L. 2016, chs. 1 to 64); N.C. Gen. Stat. Ann. § 90–95 (West, Westlaw through 2016–4 of 2016 Extra and Reg. Sess. of Gen. Assemb.); N.D. Cent. Code Ann. § 19–03.1–23 (West, Westlaw through 2015 Reg. Sess. of 64th Leg.); Ohio Rev. Code Ann. § 2925.03 (West, Westlaw through Files 1 to 77 of the 131st Gen. Assemb. (2015–2016)); Okla. Stat. Ann. tit. 63, § 2–401 (West, Westlaw through ch. 387 of 2d Reg. Sess. of 55th Leg. (2016)); Or. Rev. Stat. Ann. § 475.880 (West, Westlaw through legis. effective June 2, 2016 of 2016 Reg. Sess.); 35 Pa. Stat. and Const. Stat. Ann. § 780–113 (West, Westlaw through 2016 Reg. Sess. Act 35); R.I. Gen. Laws Ann. § 21–28–4.01 (West, Westlaw through ch. 32 of Jan. 2016 Sess.); S.C. Code Ann. § 44–53–370 (West, Westlaw through 2016 Act No. 167); S.D. Codified Laws § 22–42–2 (West, Westlaw through Sess. Laws effective June 30, 2016); Tenn. Code Ann. § 39–17–417; Tex. Health & Safety Code Ann. § 481.102 (West, Westlaw through 2015 Reg. Sess. of 84th Legis. Reg. Sess.); Utah Code Ann. § 58–37–8 (West, Westlaw through 2015 1st Spec. Sess.); Vt. Stat. Ann. tit. 18, § 4231 (West, Westlaw through No. 115 of 2015–2016 Gen. Assemb. except Act Nos. 103 & 113); Va. Code Ann. § 18.2–248 (West, Westlaw through end of 2015 Reg. Sess.); Wash. Rev. Code Ann. § 69.50.401 (West, Westlaw through 2016 Reg. Sess.); W. Va. Code Ann. § 60A–4–401 (West, Westlaw through 2016 Reg. Sess. legis.); Wis. Stat. Ann. § 961.41 (West, Westlaw through 2015 Act 392); Wyo. Stat. Ann. § 35–7–1031 (West, Westlaw through 2015 Gen. Sess.).

and a misdemeanor in others—a difference that might challenge the continuing nature of the infamy attaching to offense. Instead, for over ninety years it has been and still remains a serious crime in this state. Any easing of the societal judgment toward the criminal nature of some drugs and some types of offenses remains nebulous, and in no cases we could find has the easing extended to cocaine delivery. It is not misplaced within our law as a felony offense.

Griffin's remaining challenges to the statutes and regulations governing voting and the restoration process were dependent on a finding that her conviction did not qualify as an infamous crime. Since we conclude that infamous crime under the constitution means felony crime, we need not address these issues.

Our great advantage as a democracy is found in the clamor of debate democracy encourages. *See* 1 Alexis de Tocqueville, *Democracy in America* 265–67 (Henry Reeve trans., D. Appleton Co. 1904) (1835). This advantage, however, is not always shared equally among all people in all issues. The clamor of debate most often occurs for those issues that affect those people with the most powerful voices. Yet all issues need the clamor of debate to advance. Moreover, debate is not just needed for the politics of democracy. It is also needed by courts when called to interpret constitutional doctrine in our evolving world to hear the judgment of the legislature, our citizens, social science, and the scientific disciplines.

In this case, the legislative judgment was clearly expressed, and there are no facts or scientific evidence to undermine that judgment. In truth, the clamor of debate has largely passed over the issue of disqualifying voters in Iowa for a conviction of an infamous crime, and courts are unable to move issues forward on their own perceptions of infamy in today's society. In this case, there is insufficient evidence to

overcome the 1994 legislative judgment, and we must accept it today as the standard for infamous crime. It will be up to our future democracy to give the necessary voice to the issue and engage in the debate that advances democracy.

In the end, we are constrained to conclude that all objective indicia of today's standard of infamy supports the conclusion that an infamous crime has evolved to be defined as a felony. This is the community standard expressed by our legislature and is consistent with the basic standard we have used over the years. It is also consistent with the constitutional history, text, and purpose of the provision.

**VIII.  Conclusion.**

We affirm the district court's grant of summary judgment in favor of Secretary of State Pate and Lee County Auditor Fraise and dismissal of Griffin's claim.

**AFFIRMED.**

Waterman, Mansfield, and Zager, JJ., join this opinion. Wiggins, J., files a dissenting opinion in which Hecht and Appel, JJ., join. Hecht, J., files a dissenting opinion in which Wiggins and Appel, JJ., join. Appel, J., files a dissenting opinion in which Wiggins and Hecht, JJ., join.

**WIGGINS, Justice (dissenting).**

In *Chiodo v. Section 43.24 Panel*, I was compelled to dissent from the plurality decision. 846 N.W.2d 845, 863–65 (Iowa 2014) (Wiggins, J., dissenting). In doing so, I made two points. The first was that it is this court's duty and obligation, not the legislature's, to interpret the meaning of the phrase "infamous crime" in article II, section 5 of the Iowa Constitution. *Id.* at 864. It appears from the opinions filed today, the court agrees with this principle. Today, I reaffirm my position on this point of law.

I also agree with the court's view that the Iowa Constitution is a living document. As we have said numerous times in our jurisprudence:

> [W]e recognize that unlike statutes, our constitution sets out broad general principles. A constitution is a living and vital instrument. Its very purpose is to endure for a long time and to meet conditions neither contemplated nor foreseeable at the time of its adoption. Thus the fact a separate juvenile court system was not in existence at the time our constitution was adopted in 1857 should not blindly mandate an absurd result because our forefathers had not yet seen fit to establish a separate juvenile court system. Sometimes, as here, the literal language must be disregarded because it does violence to the general meaning and intent of the enactment.

*In re Johnson*, 257 N.W.2d 47, 50 (Iowa 1977) (citations omitted); *see also State v. Barker*, 116 Iowa 96, 105, 89 N.W. 204, 207 (1902) (reciting these same principles over 100 years ago).

In my *Chiodo* dissent, I also expressed unwillingness to deviate from our prior caselaw defining "infamous crimes" due to the uncertainty it would cause for voters and election officials in this state. 846 N.W.2d at 864–65. Today I am prepared to change my position on this point. I do so for two reasons. First, Justices Appel and Hecht have set forth

compelling reasoning and analysis in their opinions concerning how voters and election officials can determine who is an eligible voter. Additionally, the majority's analysis is flawed in that it does not truly consider the consensus among other states, most of which allow at least certain felons to vote. By focusing solely on our cruel-and-unusual-punishment jurisprudence to arrive at its conclusion, the majority's incomplete analysis gives short shrift to a matter concerning individual rights. Its approach represents a stark retreat from the robust analysis of individual rights under the Iowa Constitution this court traditionally applies. *See generally Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009) (applying our traditional approach to matters involving individual rights under the Iowa Constitution).

More importantly, the brief of the Polk County Auditor has caused me to reevaluate my thoughts on this issue. The Polk County Auditor administers the election in the largest and most diverse county in the state. In his brief, he states that under a protocol similar to that urged by Justices Appel and Hecht, he would be able to implement and administer a policy that would ensure all persons with prior felony convictions who were eligible to vote could do so.

For this reason, I cannot join the majority opinion. Therefore, I dissent and join Justices Appel and Hecht in their dissents.

Hecht and Appel, JJ., join this dissent.

**HECHT, Justice (dissenting).**

I do not share the majority's conclusion that Griffin was convicted of an "infamous crime" supporting her disenfranchisement under article II, section 5 of the Iowa Constitution or Iowa Code section 39.3(8) (2013).[18] I believe an infamous crime that disqualifies a citizen from voting must at least feature some nexus to the electoral process. Accordingly, I respectfully dissent.

The majority concludes Griffin's 2008 conviction of delivery of 100 grams or less of cocaine in violation of Iowa Code section 124.401(1)(*c*)(2)(b) (2007), a Class "C" felony, is an infamous crime.[19] The majority also notes all fifty states criminalize delivery of cocaine and the offense is a serious one causing continuing harm to society.

As the majority correctly observes, the drafters of our constitution did not define "infamous" in this context. The many meanings courts and legal scholars assigned to the word over the centuries are well documented in the majority's opinion. Although the legislature expressed its understanding in 1994 that all felony crimes are infamous for purposes of identifying eligible voters, *see* 1994 Iowa Acts ch. 1169, § 7, the task of interpreting the Iowa Constitution falls to this court—not

---

[18]In addition to her challenge to section 39.3(8) as applied, Griffin contends several other statutes regulating election processes—including Iowa Code sections 43.18(9), 48A.6(1), 48A.14(1)(*e*), 48A.30(1)(*d*), 49.79(2)(*f*) and 57.1(2)(*c*)—as well as the current voter registration forms and related regulations, the Governor's Executive Order 70, and related procedures all serve to disqualify persons convicted of noninfamous felony offenses as electors and are therefore unconstitutional as applied.

[19]Griffin also has a 2001 conviction for possession of ethyl ether in violation of Iowa Code section 124.401(4)(*c*) (2001), a Class "D" felony. That conviction is not relevant in this case because Griffin discharged the sentence in 2006, when Executive Order 42 was in force, and Executive Order 70 does "not affect the restoration of rights . . . granted prior to" its 2011 effective date.

the legislature. *See Varnum v. Brien*, 763 N.W.2d 862, 875 (Iowa 2009); *see also Chiodo v. Section 43.24 Panel*, 846 N.W.2d 845, 853 (Iowa 2014) ("In the end, it is for the courts to interpret the constitution."); *Peel v. Burk*, 197 N.W.2d 617, 622 (Iowa 1972) (Reynoldson, J., dissenting) ("This court, not the legislature, is empowered to interpret the constitution."). "The legislature may not add to or subtract from the voter qualifications under the constitution." *Chiodo*, 846 N.W.2d at 852; *Coggeshall v. City of Des Moines*, 138 Iowa 730, 737, 117 N.W. 309, 311 (1908).

In the plurality opinion in *Chiodo*, Chief Justice Cady explained "the concept of disenfranchisement was not meant to punish certain criminal offenders or persons adjudged incompetent, but to protect the 'purity of the ballot box.'" *Chiodo*, 846 N.W.2d at 855 (quoting *Snyder v. King*, 958 N.E.2d 764, 781 (Ind. 2011)). Further explicating the drafters' objective in article II, section 5, he wrote,

> Our drafters wanted the voting process in Iowa to be meaningful so that the voice of voters would have effective meaning. Thus, disenfranchisement of infamous criminals parallels disenfranchisement of incompetent persons under article II, section 5. The infamous crimes clause incapacitates infamous criminals who would otherwise threaten to subvert the voting process and diminish the voices of those casting legitimate ballots. As a result, the regulatory focus of disenfranchisement under article II reveals the meaning of an "infamous crime" . . . looks not only to the classification of the crime itself, but how a voter's conviction of that crime might compromise the integrity of our process of democratic governance through the ballot box.

*Id.* at 856. I joined the plurality opinion in *Chiodo*, *see id.* at 857, and I continue to believe the animating purpose of the disenfranchisement clause is the protection of the voting process and the integrity of the institutions of democratic governance. With this fundamental understanding of the purpose of the clause, I now turn to the analytical

framework for deciding whether the district court erred in interpreting Iowa Code section 39.3(8) (2013) and article II, section 5 of the Iowa Constitution.

The right Griffin asserts—the right to vote—is a fundamental right. *Devine v. Wonderlich*, 268 N.W.2d 620, 623 (Iowa 1978); *accord Chiodo*, 846 N.W.2d at 848 ("Voting is a fundamental right in Iowa, indeed the nation."). Voting occupies a "vital role in our system of government by providing citizens with a voice in our democracy and in the election of those who make the laws by which all must live." *Chiodo*, 846 N.W.2d at 848. Although this right is essential to fulsome participation in self-government, it is not absolute. *Id.* at 849. Because the right is fundamental, we must apply strict scrutiny in deciding Griffin's claim. A law that impedes a fundamental right is unconstitutional if it is not narrowly tailored to serve a compelling government interest. *Santi v. Santi*, 633 N.W.2d 312, 317 (Iowa 2001). In my view, disenfranchising voters for class "C" felony drug offenses will not advance the integrity of elections or institutions of government. Indeed, I am not convinced that Griffin's conviction for delivery of cocaine or her subsequent exercise of the right to vote will tend to threaten or subvert the voting process; nor will it diminish in any untoward manner the voices of other voters.

I further conclude section 39.3(8) and the related statutes disenfranchising all felons fail to pass strict scrutiny analysis because the classification of all felonies as infamous crimes is not narrowly tailored to serve any legitimate purpose of the disqualification clause. The statute's definition of infamous instead sweeps broadly past those crimes which might be plausibly understood to diminish the integrity of the voting process or the integrity of democratic institutions of governance, and it disenfranchises persons—like Griffin—whose criminal

conduct is completely unrelated to any legitimate nonpunitive and protective purpose of the disqualification clause.

Our strict scrutiny of the statutory framework disenfranchising Griffin and others similarly situated cannot be driven by majoritarian preferences about the propriety of disqualifying all felons as electors. Given the fundamental nature of the right to vote, we should not deny it to Griffin just because most folks favor disenfranchisement of all felons; neither should we deny her the right because "that is the way it's always been in Iowa" or because "that's the way it's done elsewhere." Our scrutiny must instead confront the hard question of whether there is a compelling governmental interest in disenfranchising her for drug-related offenses. In my view, there is not.

The notion that allowing Griffin to vote will render the ballot box impure, disrupt the electoral process, or damage institutions of democratic governance is fanciful at best. I posit there is no legitimate basis for concluding Griffin's vote will have any such adverse effects; and precluding her vote will, in my view, advance no compelling government interest. Her disenfranchisement instead seems to rest on the notion that allowing convicted felons who have discharged their sentences to vote "will taint the body politic." Mary Sigler, *Defensible Disenfranchisement,* 99 Iowa L. Rev. 1725, 1730 (2014) [hereinafter Sigler]. But that notion is misguided because it relies on the "mystical claim" that all felons are tainted and therefore will somehow infect the entire electoral process, *see* George P. Fletcher, *Disenfranchisement as Punishment: Reflection on the Racial Uses of* Infamia, 46 UCLA L. Rev. 1895, 1899 (1999), and because it is "a call for retribution with no tangible benefit," Mark Haase, *Civil Death in Modern Times: Reconsidering*

*Felony Disenfranchisement in Minnesota*, 99 Minn. L. Rev. 1913, 1933 (2015) [hereinafter Haase].

In reaching my conclusion that section 39.3(8) and the related statutes relied upon by the respondents in denying Griffin access to the polls fail to serve a compelling government interest, I am aided by "constitutional facts," including public policy arguments. *See Varnum*, 763 N.W.2d at 881, 898–906 (analyzing "all of the material tendered by the parties," including public policy arguments, to assist in the review of the constitutionality of a statute); *Santi*, 633 N.W.2d at 318–19 (considering whether a law "strengthen[ed] extended familial bonds" or caused "family disruption" in deciding a constitutional challenge to a statute). I have also considered the societal impact of denying the franchise to those convicted of noninfamous crimes. *See Varnum*, 763 N.W.2d at 881 (noting "judicial decision-making in the context of constitutional issues" may require courts to analyze facts beyond those relating to the parties and their particular circumstances, including "social, economic, political, or scientific facts").

Following the issuance of Executive Order 70, more than 14,000 Iowans were disenfranchised in almost four years. *See* Editorial, *No Vote for Iowa's Felons*, Cedar Rapids Gazette (Dec. 7, 2014), www.thegazette.com/subject/opinion/staff-editorial/no-vote-for-iowas-felons-20141207 (reporting that from January 2011 to December 2014, "roughly 14,500" Iowans completed their sentences after committing a felony, but fewer than 100 regained their voting rights). Because many of these disenfranchised felons—like Griffin—were convicted of crimes having no relationship to the integrity of the electoral process or other democratic institutions, I believe a negative societal impact has occurred. Voting encourages persons to become informed about and involved in

their communities' civic affairs—behaviors that maximize the chances of rehabilitation for those convicted of crimes. Disqualification, on the other hand, stigmatizes felons and undermines their reintegration to society by treating them as second-class citizens even after they have served their prison sentences. *See, e.g.*, Atiba R. Ellis, *Tiered Personhood and the Excluded Voter*, 90 Chi.-Kent L. Rev. 463, 477 (2015) ("[D]isenfranchisement creates a permanent underclass of citizenry whose interests are not heard . . . with no hope of ever effectively reengaging with society."); Sigler, 99 Iowa L. Rev. at 1739 ("[P]ermanent exclusion of offenders, certainly those already released from prison, is tantamount to political exile and inconsistent with the rights and responsibilities of citizenship . . . ."); Howard Itzkowitz & Lauren Oldak, Note, *Restoring the Ex-Offender's Right to Vote: Background and Developments*, 11 Am. Crim. L. Rev. 721, 732 (1973) ("The offender finds himself released from prison, ready to start life anew and yet at election time still subject to the humiliating implications of disenfranchisement . . . . Denying him the right to vote forbids his participation in the most crucial function of a democratic society—the electoral process—and is likely to reaffirm feelings of alienation and isolation, both so detrimental to the reformation process."). Some evidence even suggests disenfranchisement is associated with increased crime rates. *See* Christopher Uggen & Jeff Manza, *Voting and Subsequent Crime and Arrest: Evidence from a Community Sample*, 36 Colum. Hum. Rts. L. Rev. 193, 213 (2004) (collecting data and concluding "a relationship between voting and subsequent crime and arrest is . . . supported by empirical evidence"); *see also* Hadar Aviram & Jessica L. Willis, *Reintegrating Citizens: Felon Enfranchisement, Realignment, and the California Constitution*, 27 J. C.R. & Econ. Dev. 619, 652–53 (2015) (discussing two

studies); Haase, 99 Minn. L. Rev. at 1927 ("The evidence shows that disenfranchisement does not deter crime or lower recidivism. Public safety is thus not advanced and may actually be undermined by felony disenfranchisement.").

Disenfranchisement of noninfamous felons also tends to depress the votes of others. The propensity of young people to vote is correlated with their parents' behavior and resources. Eric Plutzer, *Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood*, 96 Am. Pol. Sci. Rev. 41, 42–43 (2002). Accordingly, a parent's disenfranchisement tends to discourage voting by other family members. *See* Christopher Haner, *Felon Disenfranchisement: An Inherent Injustice*, 26 J. C.R. & Econ. Dev. 911, 917 (2013) [hereinafter Haner] ("Individuals who are not disenfranchised . . . , especially those with parents who have suffered disenfranchisement, may not feel that voting is important or may feel that it is a useless exercise of political power because they do not see the fruits of exercising this right."); *see also* Erika Wood, *Restoring the Right to Vote* 12 (2009), www.brennancenter.org/ sites/default/files/legacy/Democracy/Restoring%20the%20Right%20to %20Vote.pdf.

When disproportionate numbers of citizens in the same community are denied the right to vote, the political power of the community's residents—including those who have never been convicted of a crime—is weakened. *See* Aman McLeod et al., *The Locked Ballot Box: The Impact of State Criminal Disenfranchisement Laws on African American Voting Behavior and Implications for Reform*, 11 Va. J. Soc. Pol'y & L. 66, 77–78 (2003) (collecting voter turnout data, comparing it among states, and concluding "mean voter turnout . . . is statistically lower in states with moderately to extremely restrictive disenfranchisement laws"); Reuven

Ziegler, *Legal Outlier, Again? U.S. Felon Suffrage: Comparative and International Human Rights Perspectives*, 29 B.U. Int'l L.J. 197, 208 (2011) ("[E]xpelling the convict from the community fails to recognize that she remains a community member."); *see also* Haner, 26 J. C.R. & Econ. Dev. at 917 ("If a neighborhood has a large number of citizens living in it who are disenfranchised, the community loses power . . . .").

I am persuaded that disenfranchising persons convicted of noninfamous offenses has other deleterious social consequences. It is a component of the "otherness" observed by one commentator, promoting a separation between community members and law enforcement officers. *See* William Stuntz, *The Collapse of American Criminal Justice* 310–12 (2011). As a result, the effectiveness of community policing may be undermined, especially in communities with high rates of disenfranchisement. *Cf. id.*

I emphasize here my purpose is not to diminish the gravity of Griffin's felony conviction, for which she has been sentenced and punished. I merely conclude continuing to disenfranchise her for that conviction serves no compelling government interest. Because I believe Griffin's disenfranchisement undermines the government's compelling interest in her rehabilitation and reintegration to society after her sentence was discharged, I would reverse the district court and remand for entry of a judgment declaring Griffin's 2008 criminal conviction does not render her presumptively ineligible to vote.

Wiggins and Appel, JJ., join this dissent.

**APPEL, Justice (dissenting).**

The majority does its best to interpret an anachronistic constitutional provision in the modern context. It is not an easy task. For the reasons expressed below, I come to a different conclusion than the majority. I believe the term "infamous crime" in article II, section 5 of the Iowa Constitution does not sweep so far as to disqualify Griffin from voting. As a result, I respectfully dissent.

In this case, Griffin has fully satisfied the demands of the criminal law as enacted by the Iowa legislature and she has been discharged from the criminal justice system. In colloquial terms, she has paid her debt to society and returned to normal life. The question here is whether the Iowa Constitution permits the legislature to prohibit all felons—regardless of the nature of the underlying crime—from exercising the fundamental right to vote after the criminal sanctions imposed as a result of conviction have been fully satisfied.

The question is determined by our interpretation of article II of the Iowa Constitution dealing with the right of suffrage. Article II, section 1 generally provides that every citizen who is a resident of the state "shall be entitled to vote at all elections." Iowa Const. art. II, § 1. More than a hundred years ago, we stated that the right to vote is "a political right of the highest dignity." *Coggeshall v. City of Des Moines*, 138 Iowa 730, 737, 117 N.W. 309, 312 (1908). More recently, the United States Supreme Court has said, "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063, 119 L. Ed. 2d 245, 252 (1992) (quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S. Ct. 983, 990, 59 L. Ed. 2d 230, 241 (1979)).

Yet article II, section 5 of the Iowa Constitution disqualifies from voting persons "adjudged mentally incompetent to vote" or "convicted of any infamous crime." Our task is to determine the boundary between the powerful, general command of article II, section 1—vesting the right to vote in every citizen—with the exception provided in article II, section 5—disqualifying persons convicted of infamous crimes from voting. *See Hutchins v. Hanna,* 179 Iowa 912, 916, 162 N.W. 225, 227 (1917) ("[I]n interpreting the Constitution, the court should consider all matter *in pari materia*; and all provisions on the same subject matter shall, if possible, be given effect.").

This case involves three questions. First, what branch of government decides where the boundary lies between these two provisions? Second, what substantive standards should the responsible branch of government use in placing the boundary? Third, how should the standards be applied in the case of Griffin?

In answering the first question—which branch of government is responsible for deciding where the boundary lies—I begin with analysis of the text of article II, section 5 and the historical context surrounding its development. The "infamous crimes" language of article II, section 5 arose from the Iowa Constitution of 1846. Iowa Const. of 1846, art. III, § 5. Prior to 1846, however, a number of state constitutions expressly vested the power to determine what crimes disqualified persons from voting in their legislatures. For example, the Indiana Constitution of 1816 provided, "The general assembly shall have full power to exclude from electing, or being elected, any person convicted of any infamous crime." Ind. Const. of 1816, art. VI, § 4; *see Snyder v. King,* 958 N.E.2d 764, 774–75 (Ind. 2011). Similarly, the Illinois Constitution of 1818 stated, "The General Assembly shall have full power to exclude from the

privilege of electing or being elected any person convicted of bribery, perjury or any other infamous crime." Ill. Const. of 1818, art. II, § 30. The Missouri Constitution of 1820 also provided that "[t]he general assembly shall have power to exclude . . . from the right of suffrage, all persons convicted of bribery, perjury, or other infamous crime." Mo. Const. of 1820, art. III, § 14. The Rhode Island Constitution of 1842 expressly vested in its legislature power over suffrage, stating, "Nor shall any person convicted of bribery, or of any crime deemed infamous at common law, be permitted to exercise that privilege, until he be expressly restored thereto by act of the General Assembly." R.I. Const. of 1842, art. II, § 4.

Like the state constitutions of Indiana, Illinois, Missouri, and Rhode Island, the proposed Iowa Constitution of 1844 explicitly vested the general assembly with the power to regulate the franchise. Under the proposed Iowa Constitution, persons were disqualified from voting when their crimes were declared "infamous by act of the legislature." Iowa Const. of 1844, art. III, § 5. In the Iowa Constitution of 1846, however, the legislature no longer had a role in determining disqualification of voters related to infamous crimes. The power of the legislature was deleted, and instead, article III, section 5 simply stated that persons "convicted of any infamous crime" were disqualified. Iowa Const. of 1846, art. III, § 5.

Against the historical backdrop, I conclude that the deletion of legislative authority in article III, section 5 should be given its intended effect. The determination of which crimes might qualify as infamous for purposes of disqualification from suffrage rests with the court, not with the general assembly. The plurality in *Chiodo v. Section 43.24 Panel* came to the right conclusion on this issue. 846 N.W.2d 845, 855 (Iowa

2014) ("[I]t appears the drafters at our 1857 constitutional convention intended to deprive the legislature of the power to define infamous crimes.").

I now turn to the second question: What standard should the court apply to determine which crimes are infamous? This is a difficult question, as the term "infamous crime" is famously ambiguous. As noted by the Supreme Court of Missouri in 1858, the term "infamous" is of "indefinite import." *Birch v. Benton*, 26 Mo. 153, 159 (1858). In *Chiodo*, the plurality correctly noted that "[a]ny definition of the phrase 'infamous crime' has vast implications and is not easy to articulate." 846 N.W.2d at 856. If there is any agreement in this case, it is that the term "infamous crime" is ambiguous.

Yet the overall textual context may narrow the range of interpretive options for ambiguous terms and phrases. Specifically, the drafters of the Iowa Constitution of 1846 distinguished between the terms "infamous crimes" and "felonies." In several places, the Iowa Constitution used the term "felony." In article III, section 2 the framers used the language "treason, felony, or breach of peace." Iowa Const. of 1846, art. III, § 2. The same phrase is used in article IV, section 12, which prevented representatives and senators from being arrested when serving at the General Assembly for all but those crimes. Iowa Const. art. IV, § 12.

But the framers did not use the term "felony" in article II, section 5 of the Iowa Constitution of 1857. If the 1846 and 1857 framers wished to disenfranchise all felons, they could have said so. We have often said that when a legislative body uses different terms in an enactment we assume different meanings are intended. *Johnson v. Iowa Dist. Ct.*, 756 N.W.2d 845, 850 (Iowa 2008), *superseded by statute on other grounds,*

2009 Iowa Acts ch. 116, § 1; *Miller v. Marshall County*, 641 N.W.2d 742, 749 (Iowa 2002). Since the framers rejected the term "felony" as the test for voter disqualification, it would be doubly odd to allow the rejected term to be reinserted as a result of legislative action, particularly when the constitutional drafters eliminated the role of the legislature in defining infamous crimes.

Further, other state constitutions use the term "felony" to disqualify voters. *See, e.g.*, Del. Const. of 1831, art. IV, § 1 ("[N]o . . . person convicted of a crime deemed by law felony, shall enjoy the right to an elector . . . ."); Minn. Const. of 1857, art. VII, § 2 ("[N]o person who has been convicted of treason, or any felony . . . shall be entitled or permitted to vote at any election in this State."). Iowa simply chose different language.

To me, the text and related history make it quite clear that the court must determine the meaning of the term "infamous crimes" and that the term is not synonymous with "felony." This, of course, is not the end of the matter, but only a good beginning. Having determined that the responsibility is vested with the courts to determine the meaning of infamous crimes and that infamous crimes are not the equivalent of felonies does not decide the question before us. While all felonies are not infamous crimes, does Griffin's felony conviction of delivery of cocaine qualify as an infamous crime under article II, section 5?

I now turn to the functional context, which may help bring an ambiguous term into clearer focus. In some circumstances, the context in which a general term is used will cause us to give it a narrow interpretation. *See Des Moines Flying Serv., Inc. v. Aerial Servs., Inc.*, 880 N.W.2d 212, 221 (Iowa 2016) (declaring "[c]ontext is king" in interpretation of an U.C.C. provision); *U.S. Bank Nat'l Ass'n v. Lamb*, 874

N.W.2d 112, 119 (Iowa 2016) (interpreting "all liens" to mean all judgment liens based on context); *Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 72 (Iowa 2015) (giving a narrow interpretation to the broad phrase "all information" based on context). These cases stand for the commonsense proposition that general phrases with potentially broad application may be given a narrow interpretation when the context of the phrase so requires.

The question is thus not free-standing or abstract. Instead, as noted by Professor LaFave, the meaning of the term "infamous crime" may "depend, to a large extent, on the purpose for which the distinction is to be made." 1 Wayne R. LaFave, *Substantive Criminal Law* § 1.6(d), Westlaw (database updated Oct. 2015) [hereinafter LaFave]; *see also* 21 Am. Jur. 2d *Criminal Law* § 23 (2016) ("The meaning of the term 'infamous crime' may vary according to the context in which it arises . . . ."). The specific question here is the meaning of the term "infamous crime" in the context of the constitutional disqualification of a citizen from the fundamental right to vote as an elector.

I take the lesson of these cases and authorities and apply them here. For instance, in the context of entitlement to presentation before a grand jury under the Fifth Amendment, the term "infamous crime" turns on the length of punishment. *Ex parte Wilson*, 114 U.S. 417, 425–26, 5 S. Ct. 935, 939, 29 L. Ed. 89, 92 (1885). A completely different approach, however, has been taken to the definition of infamous crime in the context of competency of a person to testify. In this context, an infamous crime is determined not by the length of punishment, but on the nature of the crime. *See, e.g., Palmer v. Cedar Rapids & Marion Ry.*, 113 Iowa 442, 447, 85 N.W. 756, 758 (1901) ("It is well settled that in determining whether the crime . . . is an infamous crime, which will

disqualify him from testifying, the nature of the crime, and not the punishment which may be inflicted therefor, is the test."); 1 Charles F. Partington, *The British Cyclopeadia of Literature, History, Geography, Law, and Politics* 847 (1836) ("A third ground of incompetency is infamy of character. . . . It is not sufficient that a party has been convicted and punished for a crime; nor that the punishment itself is deemed by the public degrading and infamous. But the offense must, in its own nature, be infamous."). Here, the question is whether a crime is considered infamous in the context of disqualification as an elector.

In several of our prior cases, we assumed that *Wilson*'s treatment of infamous crime in the context of grand jury indictment provided the proper framework for evaluating the meaning of the term in the context of voter disqualification. 114 U.S. at 429, 5 S. Ct. at 941, 29 L. Ed. at 93. For instance, in *Blodgett v. Clarke* we considered whether a person who had been convicted of forgery was eligible to run for a position on this court, which was then an elected position. 177 Iowa 575, 578, 159 N.W. 243, 244 (1916) (per curiam), *overruled by Chiodo*, 846 N.W.2d at 852. Citing *Flannagan v. Jepson*, 177 Iowa 393, 399–400, 158 N.W. 641, 643 (1916), which in turn cited *Wilson*, we held that because forgery was subject to imprisonment in the penitentiary, it would be considered an infamous crime. *Blodgett*, 177 Iowa at 578, 159 N.W. at 244. But the cut-and-paste job transferring the holding of *Wilson* into the different contexts of voter qualification or qualification to hold office, as the *Chiodo* plurality pointed out, is not persuasive. 846 N.W.2d at 851.

In considering the meaning of infamous crime in the context of voter disqualification, Professor LaFave concludes that the meaning should track the meaning of the term in the context of competency of

witnesses rather than the context of grand jury indictment. 1 LaFave § 1.6(d). According to Professor LaFave,

> Where the purpose was in former times to render a witness incompetent (or today to authorize the impeachment of the witness), the term "infamous" properly has reference to those crimes involving fraud or dishonesty or the obstruction of justice (sometimes called *crimen falsi*). Where the term is used in connection with disbarment or disqualification to hold office, vote or serve on a jury, it generally has a similar meaning.

*Id.*

Professor LaFave cites *Snyder* in support of his approach. *Id.* § 1.6(d) n.80. In *Snyder,* the Indiana Supreme Court concluded that the term "infamous crime" was not synonymous with felony for purposes of the infamous crimes clause of the Indiana Constitution. 958 N.E.2d at 771. The *Snyder* court reasoned that the definition of infamous crime rests upon the context in which it is used. *Id.* at 777. The *Snyder* court recognized that in the context of qualification of witnesses, the focus is on the nature of the crime itself and not the punishment. *Id.* at 778. The *Snyder* court rejected the proposition that all modern felonies are infamous, noting that under traditional Indiana evidence law, only nine classic common law offenses were considered infamous. *Id.* at 779. Similarly, infamous crimes under Iowa evidence law traditionally were treason, *crimen falsi,* and felonies *at common law. Carter v. Cavenaugh,* 1 Greene 171, 176 (Iowa 1848).

The *Snyder* court noted that the Webster's dictionary contemporaneous with the enactment of the Indiana Constitution defined infamous as "most vile; base; detestable." 958 N.E.2d at 780 (quoting Noah Webster, *A Dictionary of the English Language* 202 (rev. ed. 1850)). For the Indiana court, the question was what crimes could be considered "most vile; base; detestable" in the context of the purpose of the

constitutional provision disqualifying persons convicted of infamous crimes. *Id.* The purpose of the constitutional provision, according to the *Snyder* court, was "to preserve the integrity of elections." *Id.* at 782. In order for a crime to be infamous under the regulatory constitutional provision, there had to be a nexus between the crime and the regulatory purposes of the statute. *Id.* Infamous crimes, for the purpose of voter disqualification, thus were those crimes involving "an affront to democratic governance or the public administration of justice such that there is a reasonable probability that a person convicted of such a crime poses a threat to the integrity of elections." *Id.* The *Snyder* court concluded that there was no such nexus between the crime at issue— battery—and protection of the "integrity of the election process." *Id.* at 782–83.

The *Snyder* court cited the California case *Otsuka v. Hite*, 414 P.2d 412 (Cal. 1996) (en banc),[20] in support of its holding. 958 N.E.2d at 781–82. In *Otsuka,* the California Supreme Court considered whether conviction of failure to register for selective service amounted to an infamous crime sufficient to disenfranchise the voter under the California Constitution. 414 P.2d at 414. Significantly, the disqualification provision in the California Constitution was nearly identical to article II, section 5 of the Iowa Constitution and in all likelihood was actually

---

[20]The California Supreme Court overruled *Otsuka* in *Ramirez v. Brown*, 507 P.2d 1345, 1353 (Cal. 1973). In *Ramirez,* however, the California Supreme Court overruled *Otsuka* not because it went too far in protecting the right to vote, but because it did not go far enough. *Id.* The *Ramirez* court ruled that the California constitutional provision violated federal equal protection because it imposed undue burdens on the right to vote. *Id.* *Ramirez* was then overturned on appeal by the United States Supreme Court. *Richardson v. Ramirez,* 418 U.S. 24, 56, 94 S. Ct. 2655, 2671, 41 L. Ed. 2d 551, 572 (1974). Because of *Otsuka*'s unique procedural history, the *Snyder* court's reliance on its reasoning remains apt.

based upon the Iowa constitutional provision since the delegates to the 1849 California constitutional convention had the Iowa Constitution as a model. *See* J. Ross Browne, *Report of the Debates in the Convention of California* 24 (1850) (reporting that every member of the convention was provided a copy of the Constitution of Iowa to "take into consideration . . . as a basis for the Constitution of California").

The *Otsuka* court distinguished between infamous crimes for purposes of determining when charges must be brought before the grand jury and infamous crimes for purposes of determining the competency of a person to testify. 414 P.2d at 421. The *Otsuka* court held that the purpose of disqualification was to prevent "morally corrupt and dishonest voters [who] . . . may reasonably be deemed to constitute a threat *to the integrity of the elective process." Id.* at 422 (emphasis added). Finding no threat to the elective process, the *Otsuka* court determined that conviction for selective service crimes should not be considered infamous under the constitutional provision. *Id.* at 425.

Turning to the proper approach to the Iowa Constitution, I begin with the proposition that the disqualification provision of article II, section 5 should be narrowly construed for two reasons. First, the right to vote is fundamental to the democratic process, and as noted by the *Chiodo* plurality, abridging the right to vote "must be carefully and meticulously scrutinized." 846 N.W.2d at 856 (quoting *Devine v. Wonderlich,* 268 N.W.2d 620, 623 (Iowa 1978)). Second, article II, section 5 is a forfeiture provision. The law has traditionally construed forfeiture provisions in a narrow fashion. *See, e.g., In re Wagner,* 482 N.W.2d 160, 162 (Iowa 1992); *In re Kaster,* 454 N.W.2d 876, 877 (Iowa 1990); 3A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction* § 68:5, at 340 (7th ed. 2010).

Based on the above considerations, I conclude that the approach in *Snyder* is the correct one. 958 N.E.2d at 779, 782–83. Infamous crimes, for purposes of article II, section 5, are those that undermine the integrity of the election process. As suggested by LaFave, these infamous crimes are *crimen falsi*—crimes where the honesty and integrity of the convicted person is drawn in question, or crimes that interfere with the electoral process. *See* 1 LaFave § 1.6(d).

I now turn to the final question: the application of the standard to this case. I think it is clear that Griffin's drug crimes do not qualify as *crimen falsi* or crimes that interfere with the electoral process. No one would seriously argue that Griffin—who was placed on probation after her conviction and now has fully discharged her sentence—poses any threat to the integrity of the electoral process or that allowing her to vote threatens the administration of justice. Further, her crime was certainly not treason or common law felony. *Carter*, 1 Greene at 177. I would thus find that Griffin was not convicted of an infamous crime and that she is entitled to exercise the fundamental right to vote of every citizen under article II, section 1 of the Iowa Constitution.

I close with some observations on the implications of this case pointed out by amici who filed helpful briefs in this case. As pointed out by the briefs of the NAACP Legal Defense and Educational Fund and the League of Women Voters, the history of voter disqualification has disturbing features. In southern states after reconstruction, voter disqualification on the grounds of being convicted of infamous crimes was used as a tool to prevent African Americans from voting. Indeed, the Mississippi Supreme Court candidly explained that the purpose of its constitutional provision prohibiting persons from voting based on conviction of various offenses was to "obstruct the exercise of the

franchise by the negro race." *Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896). In 1985, the Supreme Court held that Alabama's constitutional provision disenfranchising persons convicted of a crime of moral turpitude violated equal protection under the United States Constitution. *Hunter v. Underwood*, 471 U.S. 222, 233, 105 S. Ct. 1916, 1922, 85 L. Ed. 2d 222, 231 (1985). The *Hunter* Court concluded that the crimes selected for inclusion as crimes of moral turpitude "were believed by the delegates to be more frequently committed by blacks." *Id.* at 227, 105 S. Ct. at 1919, 85 L. Ed. 2d at 227.

While there is no allegation of intentional discrimination in this case, the amici point out that felony disenfranchisement has grossly disproportionate effects on African American males. Researchers at the Sentencing Project estimate that approximately twenty-five percent of African American males in Iowa are disenfranchised by the legislature's implementation of article II, section 5. R.A. Lenhardt, *Understanding the Mark: Race, Stigma, and Equality in Context*, 79 N.Y.U. L. Rev. 803, 918–19 (2004) (citing The Sentencing Project & Human Rights Watch, *Losing the Vote: The Impact of Felony Disenfranchisement Laws in the United States* 8 (1998)). The exclusion of ex-felons in Iowa has produced a disenfranchisement rate for African Americans in Iowa that is "more than triple" the national rate. The Sentencing Project, *Iowa and Felony Disenfranchisement* 2 (2005), https://web.archive.org/web/20131019085622/http://www.sentencingproject.org/doc/publications/fd_iowa.pdf.

The amici further point out that disproportionate voter disenfranchisement does not simply impact the individual, but penalizes the communities from which wrongdoers come and reduces their political clout. As noted by the League of Women Voters, "[o]ne of the most

prominent and consistent finding[s] in [the] literature is that [felony disenfranchisement] laws produce a disproportionate effect on black communities." *See* Melanie Bowers & Robert R. Preuhs, *Collateral Consequences of a Collateral Penalty: The Negative Effect of Felon Disenfranchisement Laws on the Political Participation of Nonfelons*, 90 Soc. Sci. Q. 722, 723 (2009).

Another amicus points out that veterans of America's recent wars suffer from posttraumatic stress syndrome that can lead to felony convictions, which, in context, should not be considered so infamous as to lead to lifetime voter disqualification and the resulting stigma. Today's decision, of course, provides little comfort to them.

Further, it is not clear exactly what policies are actually advanced by voter disenfranchisement. As noted in *Dillenburg v. Kramer*, "[c]ourts have been hard pressed to define the state interest served by laws disenfranchising persons convicted of crimes." 469 F.2d 1222, 1224 (9th Cir. 1972). Given the lack of a compelling state interest and the fundamental individual interests involved, the American Bar Association recommended in 1981 that "[p]ersons convicted of any offense should not be deprived of the right to vote either by law or by the action or inaction of government officials." Andrew L. Shapiro, *Challenging Criminal Disenfranchisement Under the Voting Rights Act: A New Strategy*, 103 Yale L.J. 537, 560 (1993) (quoting ABA Standards for Criminal Justice: Legal Status of Prisoners 23—8.4, at 145 (2d ed. 1981)). Further, the American Law Institute's Model Penal Code states that "a person who is convicted of a crime shall be disqualified . . . from voting in a primary or election if and only so long as he is committed under a sentence of imprisonment." Model Penal Code § 306.3(1), 10A U.L.A. 751 (2001).

The majority opinion leaves a couple avenues of redress for those seeking to vote after fulfilling their criminal sanctions. Relief through the exercise of the gubernatorial power is a possibility, but there is no constitutional requirement that the governor establish an administrative process for restoring voting rights. Further, all administrative processes involve burdens of some kind, some slight, others more substantial. Another avenue of change, of course, is a constitutional amendment.

But for now, the majority opinion endorses a very broad interpretation of the disqualification provision of article II, section 5 of the Iowa Constitution that will disqualify thousands of Iowans from exercising the fundamental right to vote after they have fully satisfied their criminal sentences, even without a showing of nexus of the crime to the integrity of the electoral process. The likelihood is that those convicted of felonies who have fully served their sentences will have their rights subject to flip-flopping executive orders depending upon the political philosophy of the executive rather than upon a more stable legal regime. Sadly, that is exactly what ensnared Griffin into the law's web after she completed her criminal sentence.

Wiggins and Hecht, JJ., join this dissent.